EXHIBIT 2b

Clerk of the Superior Court
*** Electronically Filed ***
T. Formosa, Deputy
12/21/2022 10:50:16 AM
Filing ID 15297316

1  Jeffrey C. Matura, State Bar No. 019893
   John J. Daller, State Bar No. 034016
2  **BARRETT & MATURA, P.C.**
   8925 East Pima Center Parkway, Suite 215
3  Scottsdale, Arizona 85258
   Tel: (602) 792-5705
4  Fax: (602) 792-5710
   jmatura@barrettmatura.com
5  jdaller@barrettmatura.com

6  Attorneys for Plaintiff NEXA Mortgage, LLC

7                    **ARIZONA SUPERIOR COURT**

8                      **MARICOPA COUNTY**

9

10 NEXA MORTGAGE, LLC, an Arizona          Case No.    CV2022-016898
   limited liability company,
11                                         **COMPLAINT**

12                 Plaintiff,
                                           **[Commercial Court Assignment Requested]**
13 v.

14 SMART MORTGAGE CENTERS, INC., an
   Illinois for-profit corporation; and WILTON
15 A. PERSON,

16                 Defendants.

17

18        Plaintiff NEXA Mortgage, LLC ("NEXA") files this Complaint against Defendants

19 Smart Mortgage Centers, Inc. ("Smart Mortgage") and Wilton A. Person ("Person")

20 (collectively, "Defendants"). NEXA alleges the following against Defendants:

21                **PARTIES, JURISDICTION, AND VENUE**

22        1.      Plaintiff NEXA is an Arizona limited liability company and full-service mortgage

23 company headquartered in Chandler, Arizona which is located in Maricopa County, Arizona.

24        2.      Defendant Smart Mortgage is an Illinois for-profit corporation providing mortgage

25 banking services and has a mortgage broker license in Arizona, #1032665, that authorizes Smart

26 Mortgage to conduct business in Arizona.

                                        1

3.      Upon information and belief, Defendant Person is an Illinois resident that is admitted to practice law in the State of Illinois and representing Smart Mortgage in multiple various civil suits against NEXA and a number of NEXA's employees.

4.      Upon information and belief, a further economic relationship exists between the Defendants beyond the attorney and client relationship, which includes but is not limited to office rent/lease agreements and the provision of free legal services in exchange therefor.  Together, the Defendants have contributed to causing NEXA's damages.

5.      Jurisdiction and venue are proper as events giving rise to NEXA's Complaint occurred in Maricopa County, Arizona, and the amount in controversy exceeds the minimal jurisdictional requirements of this Court.

6.      Defendants have over the past two years targeted NEXA, its CEO, the CEO's wife's company, Secured Mortgage Processing ("SMP") – all Arizona residents/citizens – for the purpose of interfering with NEXA's business. And, Defendants have engaged in this activity with full knowledge that it would harm NEXA, which Defendants know is a citizen of the State of Arizona.

7.      Defendants' actions are specifically, consciously, and continuously targeted at an Arizona resident. As such, it is foreseeable that Defendants would be hailed into Court to address their tortious acts intended to cause harm in the State of Arizona.  As such, the exercise of jurisdiction over Defendants is consistent with that provided under the Constitution of the State of Arizona and the United States Constitution.

8.      The amount of NEXA's damages qualifies this matter as a Tier 3 case in accordance with Rule 8(b)(2) and Rule 26.2(c)(3) of the Arizona Rules of Civil Procedure.

### GENERAL ALLEGATIONS

9.      NEXA is a mortgage company headquartered in Chandler, Arizona, offering mortgage programs and services.

10.     Smart Mortgage is a corporation that provides mortgage products and services to its customers.

11.     Smart Mortgage holds mortgage broker licenses in Arizona, Florida, Iowa and Wisconsin; a mortgage company registration in Colorado; a residential mortgage license in Illinois; a loan broker license in Indiana; and a broker license in Virginia.

12.     Smart Mortgage purposefully applied for a mortgage broker license in Arizona. Smart Mortgage was first issued its Arizona Mortgage Broker License on January 11, 2022. This license authorizes Smart Mortgage to conduct business in Arizona.

13.     According to its own website, Smart Mortgage serves Arizona and has a license #1032665.

14.     As a mortgage broker, Smart Mortgage and its counsel are very familiar with the fact that a mortgage broker must be licensed in a state and that both the loan broker and its loan officers must get licensed and recertified on an annual basis.

15.     Defendants are familiar with and are necessarily aware of the fact that this recertification typically will involve a review of and considers any pending litigation against an institution.

16.     Beginning in February 2020, Defendants began a concerted effort to interfere with NEXA's business by filing an array of lawsuits and legal actions simply to interfere with NEXA and its loan officers' licensure in various states.

**The Original Will County Action**

17.     On February 20, 2020, Smart Mortgage, working through Mr. Person, filed an initial verified complaint for temporary restraining order ("TRO"), preliminary and permanent injunctive and other relief against NEXA and two of NEXA's employees, captioned *Smart Mortgage Centers, Inc. v. Brian Noe, Eileen Pruitt, and NEXA*, Case No. 20CH292 in Will County, Illinois ("First Verified Complaint"), alleging that NEXA aided and abetted former Smart Mortgage employees, Brian Noe and Eileen Pruitt, in allegedly taking the names of certain

customers they worked with when they terminated their employment with Smart Mortgage ("Original Will County Action").

18.     NEXA and the employee defendants in the Original Will County Action filed a Motion to Dismiss Smart Mortgage's First Verified Complaint on March 25, 2020.  Smart Mortgage did not respond to the Motion to Dismiss, but instead filed an Amended Complaint on June 30, 2020.

19.     NEXA and the employee defendants filed a Motion to Dismiss Smart Mortgage's First Amended Complaint on September 14, 2020.  Defendants did not respond to the Motion to Dismiss the Amended Complaint, but instead filed a Motion for Leave to File a Second Amended Complaint on October 22, 2020.

20.     On or about December 8, 2020, Smart Mortgage, working through Mr. Person, filed a parallel lawsuit against NEXA and Noe captioned *Smart Mortgage Centers, Inc. v. Brian Noe and NEXA Mortgage, LLC*, Case No. 20-cv-07248 ("Parallel Federal Action") in the United States District Court for the Northern District of Illinois, asserting essentially the same allegations as its state court Complaint in the Original Will County Action and adding a claim under the federal Defend Trade Secrets Act and Computer Fraud and Abuse Act. (*See* Complaint in Parallel Federal Action, attached as **Exhibit A**).

21.     Defendants did not respond to NEXA's Motion to Dismiss the Second Amended Complaint in the Original Will County Action, but instead filed a Third Amended Complaint on January 26, 2021.

22.     The Third Amended Complaint filed by Defendants added claims against a new party, SMP, a business entity owned by the wife of NEXA's CEO, claiming that SMP was a viable co-defendant.

23.     On February 18, 2021, Defendants filed an Amended Complaint in the Parallel Federal Action, adding Eileen Pruitt and SMP as defendants. (Amended Complaint in Parallel Federal Action, attached as **Exhibit B**).

4

24.     When NEXA moved to dismiss the Third Amended Complaint in the Original Will County Action, Smart Mortgage filed a Fourth Amended Complaint on April 13, 2021.

25.     Defendants did not respond to NEXA's Motion to Dismiss the Fourth Amended Complaint in the Original Will County Action, but instead filed a Fifth Amended Complaint on May 11, 2021.

26.     On June 4, 2021, the Northern District of Illinois stayed Defendants' Parallel Federal Action against all defendants, including NEXA because the claims were parallel to those Defendant alleged against the defendants in the Original Will County Action and thus were required to be stayed under the *Colorado River* doctrine. (*See* Order Staying Case in Parallel Federal Action, attached as **Exhibit C**).

27.     The federal court, reviewing whether the claims in the Parallel Federal Action were of a "vexatious or contrived nature" as part of the *Colorado River* analysis found:

> Smart Mortgage's conduct as relates to this suit has been suspicious, to put it mildly.  First, Smart Mortgage filed this suit the day before a settlement conference in the state court suit, which strongly suggests that its primary motivation was to gain leverage in the state court negotiations.  That is an improper use of the federal judicial system.  Next, there is no reason why Smart Mortgage could not have asserted its federal claims in the state court suit....
>
> Finally, the CFAA claim in this suit—which has no analog in the state court suit and upon which Smart Mortgage bases its argument that a stay would be improper, was asserted only after the court raised the suggestion of *Colorado River* abstention.  Again, Smart Mortgage's timing strongly suggests that injecting the CFAA claim into this case was just another tactic—this one to forestall abstention and a stay—rather than a good-faith assertion of a federal right.

(*Id.* at pp. 10-11).

28.     The federal court further opined that "Smart Mortgage would be well advised to dismiss this suit in short order, lest it exacerbate its existing exposure to possible sanctions." (*Id.* at p. 12).

29.     Hearing the warning shots, the Parallel Federal Action was then withdrawn by Defendants on June 16, 2022, and the notice of dismissal informed the federal court that Defendants reasserted the federal causes of action via amending their complaint and filing a Sixth Amended Complaint in Will County on June 10, 2021. (*See* Smart Mortgage's Notice of Dismissal in Parallel Federal Action, attached as **Exhibit D**).

30.     After such conduct, NEXA and the employee defendants in the Original Will County Action removed the action to federal court in the Northern District of Illinois on July 7, 2021, Case No. 1:21-cv-03606, now that Smart Mortgage had alleged federal claims.

31.     Defendants are aware that their lawsuit lacks merit. Indeed, on March 21, 2022, the Northern District of Illinois, which had occasion to consider Smart Mortgage's Sixth Amended Complaint after it was removed to federal court, dismissed each and every allegation premised on federal law. (*See* Order Dismissing and Remanding Case in the Original Will County Action, attached as **Exhibit E**). Although the state and federal laws are nearly identical, the state causes of action were remanded because the Court relinquished supplemental jurisdiction of the state causes of action. (*Id.*).

32.     The Original Will County Action was reinstated in Will County on May 17, 2022.

33.     Once remanded, NEXA filed another Motion to Dismiss on May 6, 2022.

34.     Defendants continued their strategy of delay tactics: Smart Mortgage filed a Motion for Limited Discovery in the Original Will County Action on May 23, 2022, simultaneously alleging that "Smart Mortgage undoubtedly has alleged the minimum level involving the unauthorized removal of confidential information and trade secrets and related claims" but that Smart Mortgage also needed discovery to "fully develop facts to support NEXA's response to Defendants' [] Motion to Dismiss." (*See* Smart Mortgage's Motion for Limited Discovery in the Original Will County Action, at pp. 2-3, attached as **Exhibit F**).

35.     Smart Mortgage's Motion for Limited Discovery is yet another example of its pattern of delay and avoidance when faced with dismissal. Twenty-seven (27) months had

passed since Smart Mortgage filed its initial complaint. During this time, Smart Mortgage filed six amended complaints to avoid responding to NEXA's four earlier motions to dismiss. Moreover, Smart Mortgage had already responded to the motions to dismiss briefed in the removed federal case nine months prior without any suggestion that discovery was needed.

36.     Smart Mortgage's Motion for Limited Discovery was granted, and NEXA and the employee defendants tendered their responses. However, instead of using the information to respond to the Motion to Dismiss, as it had promised, it sought to file another, Seventh Amended Complaint.

37.     Smart Mortgage amended their Complaint a seventh time even though their claims have no more chance to succeed at the state level than they do at the federal level. Defendants' Seventh Amended Complaint, filed on August 22, 2022, is now pending and subject to yet another Motion to Dismiss filed by NEXA.

### The Defamation Case Against NEXA Employee Brian Noe

38.     Of course, Defendants did not stop with the Original Will County Action. On November 2, 2021, Defendant Smart Mortgage, working through Mr. Person, filed another case captioned *Smart Mortgage Centers, Inc. v. Brian Noe,* Case No. 2021L000847, against one of NEXA's employees, Brian Noe, alleging defamation and violation of the Illinois Deceptive Trade Practices Act in Will County, Illinois ("Noe Case"). That lawsuit claimed Mr. Noe should be liable for $50,000 in damages based partially on Noe comparing Smart Mortgage to a character in the movie *Shawshank Redemption* in a private conversation with a former colleague at Smart Mortgage.

39.     True to form, on April 21, 2022, Smart Mortgage amended their complaint rather than respond to Mr. Noe's Motion to Dismiss.

40.     Mr. Noe's Motion to Dismiss the Amended Complaint was granted without prejudice on July 19, 2022, disposing of the entirety of the case.

1

2

3

4

5

41.     On August 11, 2022, Defendants filed a Second Amended Complaint against Mr. Noe shifting away from the statements concerning *Shawshank Redemption* comparisons and relying now on the assertion that in a private conversation, Mr. Noe allegedly made the statement to a singular individual that Smart Mortgage had no money and was going to be investigated by the Consumer Financial Protection Bureau.

6

7

8

9

10

11

42.     These latest allegations are knowingly false.  Mr. Person is personally aware that the conversation he bases these latest defamatory statements upon did not actually happen. Indeed, the former employee with whom Mr. Noe had the subject discussion was asked by Mr. Person about the conversation with Mr. Noe.  Based upon this affidavit, it is apparent Mr. Person knew Mr. Noe did not make the statements alleged in the defamation lawsuit.  As such, Mr. Person has intentionally misrepresented the conversation to support a baseless defamation claim.

12

13

14

15

16

17

18

43.     Thus, Mr. Person and Smart Mortgage filed a lawsuit with full knowledge that the premise of the lawsuit was false.  Further, even if such a lawsuit was not premised on false statements, who would file a lawsuit based on the fact that one former employee told another that their employer had "no money."  Even if such a statement could theoretically support the basis of a theoretical claim, the obvious lack of any injury demonstrates that this is merely a lawsuit filed in order to harass NEXA and its employees, particularly in light of Defendants' other litigious activities.

19

**Case Against NEXA Employee Ryan Klaic**

20

21

22

44.     Defendants filed yet another lawsuit against one of NEXA's employees, Ryan Klaic, in DuPage County Illinois, on December 14, 2021, captioned *Smart Mortgage Centers, Inc. v Ryan Klaic*, Case No. 2021CH000475 ("Klaic Action").

23

24

45.     The Complaint in the Klaic Action was similarly fashioned to the Complaint in the Original Will County Action – it was Verified and included a demand again for a TRO.

25

46.     On December 16, 2021, a Motion for a TRO was filed by Defendants.

26

8

47.     The hearing on the TRO was requested during the Christmas holiday, even though Mr. Klaic had left Smart Mortgage to join NEXA nearly four months prior, on or about August 6, 2021.

48.     The Klaic Action was removed to federal court on December 21, 2021, and then remanded on January 25, 2022, by agreement of the parties.

49.     From December 21, 2021, to January 25, 2022, Smart Mortgage made no attempt to obtain a ruling on its Motion for a TRO.

50.     On January 31, 2022, the Klaic Action was reopened in DuPage County.

51.     Shortly after the Klaic Action was remanded to DuPage County, Smart Mortgage immediately filed a Motion for a TRO.

52.     A hearing on the Motion for a TRO was held on February 8, 2022.   Smart Mortgage's TRO request was denied for several reasons, including, but not limited to:

   a. The time delay between Smart Mortgage uncovering Klaic's alleged conduct and filing this lawsuit;

   b. Smart Mortgage's complaint was verified, but the verified allegations were conclusory and lacking in specific facts to support a TRO;

   c. Smart Mortgage's TRO motion lacked an affidavit or other factual support above and beyond the conclusory allegations in the complaint;

   d. Smart Mortgage references a 2020 contract with Klaic, but only attached a 2018 contract and wants the court to enforce a 2018 contract without showing what is in the 2020 contract.

53.     Smart Mortgage, through their attorney Mr. Person, then asked for expedited discovery and an evidentiary hearing for a preliminary injunction.   Those requests were denied at that time.

54.     Defendants filed an Amended Complaint in the Klaic Action on April 5, 2022.

55.     On April 13, 2022, Defendants moved to compel depositions in the Klaic Action.

56.     On April 19, 2022, Mr. Klaic filed a Motion to Stay Discovery until after his Motion to Dismiss was decided and opposed Smart Mortgage's Motion to Compel Depositions.

9

57.     On May 4, 2022, Mr. Klaic's Motion to Stay Discovery was granted and Smart Mortgage's Motion to Compel Depositions was denied.  On the same date, Mr. Klaic's pending Motion to Dismiss was entered and continued for further handling because Smart Mortgage sought to amend its Complaint, again.

58.     On May 16, 2022, Defendants filed a Second Amended Complaint in the Klaic Action, this time adding NEXA and NEXA employee Mr. Noe.

59.     On June 30, 2022, NEXA and the employee defendants in the Klaic Action filed a Motion to Dismiss the Second Amended Complaint.

60.     One day later, on July 1, 2022, Defendants—who allegedly had sufficient information to support an injunction on essentially Christmas Eve of 2021—then sought leave to obtain pleading stage discovery.  Smart Mortgage again contradicted itself, by admitting that discovery was unnecessary at this stage by asserting that it had "undoubtedly" alleged sufficient factual allegations supporting its claims but is nonetheless "seek[ing] additional facts in an abundance of caution to respond to Defendants' [Motion to Dismiss] [.]" (*See* Smart Mortgage's Motion for Limited Discovery in Klaic Action, at pp. 2-3, attached as **Exhibit G**).  In fact, Smart Mortgage even admitted that it already "possess[es] more than a minimum level of information indicating that [Defendants] are liable to Smart Mortgage [.]" *Id.*

61.     On August 16, 2022, Smart Mortgage's Motion for Limited Discovery was denied after a hearing the same day.  The Court determined that the Motion for Limited Discovery was overbroad, citing concerns that the request resembled a potential fishing expedition.  (*See* Transcript of August 16, 2022, hearing Transcript, at p. 7, attached as **Exhibit H**) ("You have to articulate what counts, because otherwise this is a fishing expedition [.]")

62.     After denial, Defendants sought permission to re-file their Motion for Limited Discovery.  Defendants filed such motion again on August 23, 2022.

63.     After hearing on September 28, 2022, the Motion for Limited Discovery was denied again.

64.     In true fashion, Defendants then requested leave to file a Third Amended Complaint in the Klaic Action to name Mike Kortas, the CEO of NEXA, as a party on October 18, 2022.  On November 14, 2022, Defendants filed their Third Amended Complaint over objection, due to the liberal nature of pleadings permitted in Illinois.

65.     Defendants have successfully accomplished their goal of running up legal fees, and embroiling NEXA and its employees in litigation—the defendants in the Klaic Action had filed a Motion to Dismiss in May 2022, and Defendants' tactics of unnecessary pleading discovery had their intended effect: NEXA and its employees have not been able to obtain a ruling on their Motion to Dismiss for an additional five (5) months.

### Impact On NEXA And Its Employees' Licenses

66.     Since 2020, NEXA has been in the process of expanding into additional states.  It is public knowledge that in the broker community, NEXA is one of the largest mortgage brokers in the nation and has rapidly expanded over the last several years.

67.     Smart Mortgage and Mr. Person are aware that as a part of the annual recertification of State Mortgage Broker licenses and in connection with applying for new state licenses—a necessary step for a growing nationwide Mortgage Broker—the broker's litigation will be reviewed by every state before a license is granted or recertified.

68.     One of the states in which NEXA was seeking licensure as a Mortgage Broker was Massachusetts.  However, the Massachusetts Department of Banking was deeply concerned about the number of lawsuits pending in state and federal court against NEXA and its employees and the level of activity of those lawsuits.  Based primarily on the existence of these lawsuits initiated by Smart Mortgage, the amount of time the lawsuits had been pending, and the number of amendments, Massachusetts refused to issue NEXA a license to broker loans in the State.

69.     Further, due to the lawsuits, Mr. Noe—who continues to work for NEXA—was denied a mortgage broker license in Texas.

1

2

70.     Other NEXA employees, including Eileen Pruitt and Mr. Klaic, have also faced challenges having their license recertified.

3

4

71.     Mr. Person has specifically been advised multiple times of the impacts these lawsuits have had on NEXA and its employees.

5

6

7

8

72.     The denial of licenses—particularly the Massachusetts license—has prevented NEXA from hiring multiple loan officers who have indicated an interest in joining NEXA. This has blocked NEXA from hiring these loan officers and prevented NEXA from initiating operations in Massachusetts.

9

10

11

73.     NEXA estimates that it has lost at least $5 million in revenue due to the denial of its license application in Massachusetts – a denial caused directly by the continued pendency of these obviously frivolous lawsuits.

12

13

14

74.     At all times relevant herein, Defendants have known the impact that these baseless lawsuits would have on NEXA and its licenses, and yet continued to file these lawsuits taking advantage of the permissive nature of amendments at the pleading stage in Illinois.

15

16

17

18

19

75.     Further, Smart Mortgage has suffered no ascertainable damages even though they have filed eighteen (18) complaints.  On the face of these lawsuits, it is apparent that Smart Mortgage has suffered no legitimate damages.  This was confirmed by the denials of several Motions for TROs filed by Smart Mortgage in this set of cases; Smart Mortgage could not prove any immediate injury, or likelihood of success on the merits.

20

21

22

23

24

25

76.     Indeed, the allegations in these lawsuits are devoid of any mention of damages that would justify the litigation.  Mr. Person has been asked numerous times for any proof of any damages Smart Mortgage has incurred.  Not once has Mr. Person provided any such proof or rational explanation of damages.  Despite filing eighteen (18) complaints, Smart Mortgage has failed to point to any financial concrete injury it has experienced that would warrant its litigation rampage.

26

77.     It is apparent that because of the unique relationship between Smart Mortgage and Mr. Person—which upon information and belief permits Smart Mortgage to access and utilize Mr. Person's services for little or no charge—they are able to continue the initiation and maintenance of litigation simply for the purpose of interfering with NEXA's business and causing NEXA and its employees to incur substantial fees and costs defending bogus lawsuits.

## COUNT ONE

### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY AND RELATIONS

### (All Defendants)

78.     NEXA alleges and incorporates by reference all the above allegations contained in Paragraphs 1 through 77 above.

79.     NEXA has successfully sought and been granted 60 financial licenses across the United States, District of Columbia, and several territories of the United States, and had a reasonable and valid business expectancy of receiving such licenses in Massachusetts, as it had in almost all other states.

80.     Due to Smart Mortgage's own experience in the mortgage brokerage industry, Defendants knew that NEXA, in order to operate as a mortgage broker, would be required to apply for licensure in states where it was not already licensed, and to periodically renew existing licenses.

81.     Between February 2020 and the filing date of this Complaint, Defendants have purposefully filed a total of four (4) lawsuits, eighteen (18) total complaints and amendments, and three (3) requests for pre-filing discovery in lawsuits that allege no meaningful damages, where Defendants know the lawsuits have no merit. These lawsuits have included NEXA, its employees, the CEO personally, and the CEO's wife's company.

82.     Defendants have engaged in a blatant misuse of the Court system filing meritless claims and amending ad nauseum, after delaying as long as possible to seek amendment.

83.     Defendants have engaged in a conscious plan to file and maintain an active docket of lawsuits against NEXA to disrupt its license applications and renewals as well as the renewals of certain of its loan officers – namely loan officers that previously worked at Smart Mortgage and lawfully left to join NEXA.

84.     Defendants' actions are willful and malicious, premised on its resentment that multiple loan officers left Smart Mortgage to lawfully join another company, NEXA. Indeed, it was not until loan officers left Smart Mortgage to join NEXA that these lawsuits were commenced.

85.     Judges reviewing Smart Mortgage's actions have found the conduct of Smart Mortgage and its lawyers to be "suspicious, to put it mildly" and noted that Defendants were improperly using the judicial system. A judge further cautioned Defendants that they might exacerbate "existing exposure to sanctions." However, the facts surrounding the several pending cases are not before any single judge, and thus no court has had the opportunity to review Defendants' conduct in totality.

86.     In at least one case, NEXA has sworn testimony that demonstrates Smart Mortgage and Mr. Person are pursuing litigation premised on knowingly false information and allegations.

87.     Due to Defendants' tortious actions, NEXA was unable to get a license to broker mortgage loans in Massachusetts, preventing it from conducting any business in the State.

88.     As a result of Defendants' actions, NEXA has been deprived of over five million dollars ($5,000,000) in revenue.

## **PRAYER FOR RELIEF**

WHEREFORE, NEXA requests that the Court enter the following relief:

    A.    Enter judgment in NEXA's favor and against each Defendant;

    B.    Award NEXA its reasonable attorneys' fees and costs pursuant to all applicable statutes and rules; and

    C.    Award NEXA any other relief that the Court deems just and proper.

Dated December 21, 2022.

BARRETT & MATURA, P.C

By: ___ /s/ *Jeffrey C. Matura* _____
Jeffrey C. Matura
John J. Daller
8925 East Pima Center Parkway
Suite 215
Scottsdale, Arizona 85258
Attorneys    for    Plaintiff    NEXA
Mortgage, LLC

ORIGINAL of the foregoing filed
on December 16, 2022, with:

Clerk of the Court
Maricopa County Superior Court

/s/ *Holly A. McGee* _____
Holly A. McGee

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SMART MORTGAGE CENTERS, INC.,

       Plaintiff,

   vs.                 Case no.

BRIAN NOE and
NEXA MORTGAGE, LLC,

       Defendants,

## COMPLAINT

Plaintiff Smart Mortgage Centers, Inc. ("Smart Mortgage"), by and through its undersigned

counsel, files this Complaint for misappropriation of trade secrets against Defendant Brian Noe

("Noe") and Defendant Nexa Mortgage LLC ("Nexa Mortgage") and hereby alleges as follows:

## NATURE OF THE ACTION

### I.    PARTIES

1. Plaintiff Smart Mortgage is a corporation formed under the laws of the State of Illinois
   with its principal place of business at 4003 Plainfield Naperville Road, Suite 207, Naperville,
   Illinois 60564.

2. Defendant Brian Noe is an individual residing within the Northern District of Illinois.

3. Defendant, Nexa Mortgage is an Arizona limited liability company in good standing that
   provides mortgage services and products to consumers in several states and within the
   Northern District of Illinois.

### II.    JURISDICTION AND VENUE

4. Jurisdiction over this cause is based upon 28 U.S.C. Sections 1331.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that Plaintiff resides in this judicial district and all or a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

6. This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. This Court has subject matter jurisdiction over this case for misappropriation of trade secrets under Defend Trade Secrets Act of 2016 pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## FACTUAL BACKGROUND

7. On October 29, 2013, Defendant Brian Noe began employment with Smart Mortgage as a loan officer.

8. On October 29, 2013, Defendant Brian Noe signed a Loan Officer Retention Agreement with Smart Mortgage. See Exhibit A.

9. On April 12, 2014, Defendant Brian Noe and Smart Mortgage finalized the compensation package related to the October 29, 2013 Loan Officer Retention Agreement. See Exhibit A.

10. On January 1, 2018, Defendant Brian Noe signed a Loan Officer Retention Agreement with Smart Mortgage. See Exhibit B.

11. The January 1, 2018 Loan Officer Retention Agreement increased Defendant Brian Noe's financial compensation with Smart Mortgage. See Exhibit B.

12. Defendant Brian Noe was continuously employed with Smart Mortgage from October 29, 2013 through his resignation on December 20, 2019.

13. On February 1, 2018, Defendant Brian Noe downloaded the Dropbox Software Application on his Smart Mortgage company computer without authorization or consent from Smart Mortgage.

14. On February 20, 2019, Defendant Brian Noe requested and was provided Smart Mortgage's closed loan log for files he originated as a Smart Mortgage loan officer from October 29, 2013 to February 20, 2019.

15. Smart Mortgage's closed loan log was provided to Defendant Brian Noe by Smart Mortgage's operations manager, Jon Butusov, on February 20, 2019.

16. On November 22, 2019, Defendant Brian Noe submitted his final two loan applications as a Smart Mortgage employee.

17. On December 19, 2019, Defendant Brian Noe closed his final loan as a Smart Mortgage employee.

18. On December 20, 2019, Defendant Brian Noe tendered his resignation to Smart Mortgage without returning his closed loan log to Smart Mortgage.

19. On December 20, 2019 at 5:30 A.M., Defendant Brian Noe accessed and downloaded information from Smart Mortgage's client database from his company issued computer.

20. Smart Mortgage's client database contains over thirty-eight hundred (3800) unique client names.

21. Defendant Brian Noe's December 20, 2019 computer activity was discovered by an audit conducted by Smart Mortgage's Information Technology manager Paul Stretavong from January 17, 2020 to February 8, 2020.

22. Upon reviewing Defendant Brian Noe's company issued computer, Paul Stretavong discovered that Defendant Brian Noe had changed his password and deleted all of the files and the Dropbox software application from his company issued computer's hard drive on December 20, 2019.

23. Smart Mortgage was able to successfully restore Defendant Brian Noe's deleted files to his company issued computer's hard drive.

24. On December 21, 2019, Cynthia Pedraza sent personal documents to Defendant Brian Noe via his Smart Mortgage's email address for the purpose of obtaining a mortgage for John Munoz.

25. John Munoz's personal identifying information, historical client transaction information, client preferences, and personalized notes are stored in Smart Mortgage's client database.

26. On December 22, 2019, Cynthia Pedraza sent John Munoz's personal documents to Defendant Brian Noe via his Smart Mortgage's email address for the purpose of obtaining a mortgage for John Munoz.

27. On December 25, 2019, Kenneth Barber emailed Defendant Brian Noe via his Smart Mortgage's email address to inquire whether his refinance could be initiated in January 2020 to allow him to skip February and March 2020 mortgage payments.

28. Kenneth Barber's personal identifying information, historical client transaction information, client preferences, and personalized notes are stored in Smart Mortgage's client database.

29. On December 26, 2019, Defendant Brian Noe began his employment with Defendant Nexa Mortgage.

30. On December 30, 2019 and continuing to the present, Defendant Brian Noe has solicited and offered residential mortgage services to multiple individuals from Smart Mortgage's client database.

31. Smart Mortgage derives economic value from its client database because the database exclusively contains individuals who have specifically sought mortgage services with Smart Mortgage, personal identifying information, historical client transaction information, client preferences, and personalized notes.

32. Smart Mortgage's client database was created with the investment of substantial expenditures, skills, sweat equity, and time.

33. Smart Mortgage's regularly and routinely enters into contracts with several lenders including but not limited to United Wholesale Mortgage, PRMG, Inc, Home Point Financial Corporation, Union Home Mortgage Corp., Oaktree Funding Corp., Carrington Mortgage, Bayview Financial, and Flagstar Bank that purchase loans originated by Smart Mortgage.

34. Defendants are actively soliciting Smart Mortgage clients to refinance their existing loans originated by Smart Mortgage, thereby interfering with Smart Mortgage's contracts and prospective advantage with the loan purchasers.

35. As a result of Defendant's Brian Noe's breach of Smart Mortgage's client database, Smart Mortgage sent a "Cease and Desist" letter to both Defendant Brian Noe and Defendant Nexa Mortgage on January 20, 2020.

36. As a result of the Defendant Brian Noe's breach of Smart Mortgage's client database, Smart Mortgage sent letters to all Smart Mortgage clients who may have been impacted by Defendant's Brian Noe misappropriation of Smart Mortgage client's confidential and personal identifying information in early February of 2020.

37. Smart Mortgage has received numerous calls from Smart Mortgage clients concerned that their personal identifying information is compromised.

38. Accordingly, Defendant Brian Noe has caused and is causing irreparable harm to Smart Mortgage's business reputation with the impacted clients.

## BASIS OF CLAIMS

39. Defendants Brian Noe and Nexa Mortgage have misappropriated Smart Mortgage's client database for their own financial benefits.

40. Defendants Brian Noe and Nexa Mortgage have financially benefited from its continued use of Smart Mortgage's client database to market and sell mortgages loan services and products.

**Violation of The Defend Trade Secrets Act of 2016**

Plaintiff sues Defendants Brian Noe and Nexa Mortgage and alleges:

41. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-41 above as if each were more fully set forth herein.

42. Smart Mortgage is a leading mortgage loan broker currently operating in Illinois, Indiana, Colorado, and Florida and providing loan solutions to its clients based on their individual preferences and needs.

43. Smart Mortgage provides its clients with access to a diverse range of lenders and financial products.

44. The mortgage loan brokerage business is highly competitive and Smart Mortgage's success depends on numerous factors, including its ability to generate client leads, attract and retain reliable and trustworthy loan originators as well as support personnel to obtain and maintain Smart Mortgage's client relationships.

45. Smart Mortgage's client database contains over thirty-eight hundred (3800) unique client names not known or available to the general public with personal identifying information, historical client transaction information, client preferences, and personalized notes.

46. Smart Mortgage's client database is used in or intended for use in interstate commerce as Smart Mortgage operates in Illinois, Indiana, Colorado, and Florida.

47. Competitors would gain an immediate and substantial advantage by accessing Smart Mortgage's client database because the competitors would not be required to create an independent solution via its own efforts and expense.

48. Smart Mortgage invests significant financial resources in its business operations to maintain its competitive advantage and expand its client relationships.

49. Smart Mortgage has a number of policies, procedures, and agreements that it uses to protect its trade secret and confidential information, and safeguard its client relationships.

50. Smart Mortgage owns all of the computers used for its business operations.

51. Smart Mortgage does not employ portable data drives or allow employees to create new files to access and remove data from its computer systems.

52. Smart Mortgage prohibits third party software applications such as Dropbox or similar software applications to access or remove data from its computer systems.

53. Smart Mortgage's client database cannot readily be duplicated from any public sources.

54. Defendants would not have any ability to duplicate Smart Mortgage's client database or develop a comparable independent solution without spending hundreds of thousands of dollars and decades developing a similar client database.

55. Smart Mortgage's client database provides it a competitive advantage in the residential mortgage loan brokerage industry because it is able to generate client leads exclusive to Smart Mortgage and the client database contains historical client transaction information, client preferences, and personalized notes.

56. This ability to generate client leads exclusive to Smart Mortgage loan officers is the linchpin of Smart Mortgage's competitive advantage in the residential mortgage loan brokerage industry.

57. Smart Mortgage's client database was developed over a twenty-year period.

58. Smart Mortgage has invested hundreds of thousands of dollars over a twenty-year period to develop its client database.

59. Smart Mortgage's client database is not available to the general public or its competitors.

60. Smart Mortgage's client database access is restricted to a limited number of employees.

61. Smart Mortgage's client database access is password protected.

62. Smart Mortgage's loan officers are limited to accessing only client data related to files that have been specifically assigned to that particular loan officer.

63. Each loan officer's computer, loan origination software, lead management software is password protected.

64. Smart Mortgage's client database restricts any loan officer from deleting client information.

65. Smart Mortgage's client database is stored on a secure virtual private network and local private network which limits loan officers' access to only their assigned client files.

66. Smart Mortgage does not allow any employees to download third-party software on their company issued work computers.

67. Smart Mortgage requires all of its loan officers to sign Loan Officer Retention Agreements and obligates the loan officer to return all client lists and company property upon leaving the company.

68. Smart Mortgage's client database was misappropriated by Defendants Brian Noe and Nexa Mortgage.

69. Both Defendants knew or had reason to know that the misappropriation was acquired through improper means.

70.  Defendant Brian Noe solicited clients from Smart Mortgage's client database despite agreeing that he acknowledged and understood that the customers, customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents that he produced for Smart Mortgage during his employment were the sole and exclusive property of Smart Mortgage.

71.  Defendant Nexa Mortgage acquired and used information provided by Defendant Brian Noe to solicit its residential mortgage clients despite knowing or having reason to know that Defendant Brian Noe acquired the information through improper means and without the consent of Smart Mortgage after receiving a "cease and desist" letter providing written notice of Defendant Brian Noe's unlawful actions and/or a cursory review of Defendant Brian Noe's closed transactions with Defendant Nexa Mortgage.

72.  Upon information and belief, Defendant Nexa Mortgage acquired and used information provided by Defendant Brian Noe to solicit residential mortgage customers despite knowing or reason to know that the trade secret was acquired by improper means because it encouraged Defendant Brian Noe to bring his "book of business" to Nexa Mortgage.

73.  Upon information and belief, Defendant Brian Noe has willfully and maliciously misappropriated Smart Mortgage's client database containing over thirty-eight hundred (3800) unique client names with personal identifying information, historical client transaction information, client preferences, and personalized notes by copying and pasting client files.

74.  Smart Mortgage's client database is currently being used by Defendants for their financial benefit.

75. As a direct and proximate result of the actions of Defendants Brian Noe and Nexa
    Mortgage, Smart Mortgage has suffered actual and compensatory damages in an
    undetermined amount.

76. To protect its business interests and the confidentiality of business operations, Smart
    Mortgage has taken affirmative measures, including the utilization of restrictive covenants in
    its employment contracts, requiring computer username and password protection, firewalls
    limiting access to information safeguards, and restricting unauthorized use of client data.

77. The restrictive covenants in Smart Mortgage's loan retention agreements are negotiated with
    each employee as part of their employment and include any combination of clauses
    concerning confidential information. Each restrictive covenant is limited in scope to protect
    both Smart Mortgage's legitimate business interests while preventing undue hardship on the
    employee in his or her pursuit of employment in his or her area of expertise.

78. Defendant Nexa Mortgage knew or should have known that the employees they hired from
    Smart Mortgage Centers would be covered by employment contracts with restrictive
    covenants.

79. Upon information and belief, Defendant Nexa Mortgage encouraged Defendant Brian Noe
    prior to his resignation from his loan officer position at Smart Mortgage as well after he
    resigned from his loan officer position at Smart Mortgage Centers to engage in unfair and
    unlawful competition with Smart Mortgage.

80. Defendants Brian Noe and Nexa Mortgage have used and disclosed Smart Mortgage Center'
    trade secrets and confidential information in violation of Federal law.

81. As a condition of employment, Defendant Brian Noe signed an employment agreement
    with Smart Mortgage. This agreement contained several restrictive covenants, including
    clauses related to confidential information.

82. As a loan officer at Smart Mortgage, Defendant Brian Noe's duties to Smart Mortgage
    Centers included but were not limited to: (i) performing to the best of his ability all duties
    assigned to him by Smart Mortgage and to carry out all Smart Mortgage's policies and
    directives as described in the Loan Officer Retention Agreement; (ii) to fully comply with
    all state and federal laws, rules and regulations regarding the origination and processing of
    mortgage loans, (iii) to perform to the best of his ability said duties in compliance with all
    Acts and regulations affecting the residential mortgage industry, and (iv) to not use any
    confidential information regarding Smart Mortgage's business operations for his own
    benefit, or divulge, disclose, or communicate this information to any third party, without the
    prior written consent of Smart Mortgage.

83. In the restrictive covenants in his employment agreement, including those concerning
    confidential information, Defendant Brian Noe agreed that Smart Mortgage's
    customers, customer leads, customer files, customer names, and customer mortgage
    applications and related customer files and documents that he produced for Smart Mortgage
    during his employment were the sole and exclusive property of Smart Mortgage were Smart
    Mortgage's sole and exclusive property.

84. Defendant Brian Noe agreed that he would follow this and other restrictive covenants
    regarding Smart Mortgage's trade secrets and confidential business information during his
    employment with Smart Mortgage Centers and for as long as the confidentiality of trade
    secrets and proprietary business information were to be maintained under applicable law.

85. Defendant Brian Noe's agreements to abide by the restrictive covenants were supported by
    adequate consideration, which consisted of his accepting and continuing his employment and
    an increase in his compensation.

86. The restrictive covenants in his employment agreement were fair, reasonable, and necessary for the protection of Smart Mortgage's legitimate business interests.

87. During his employment with Smart Mortgage, Defendant Brian Noe had access to all of Smart Mortgage's trade secrets and confidential business information via his company issued work computer.

88. Defendant Brian Noe's company issued work computer was user and password protected, as well as protected by other measures, including a firewall.

89. Upon information and belief, Defendant Brian Noe's accessed and copied Smart Mortgage's client database on December 20, 2019.

90. Defendant Brian Noe and Nexa Mortgage are currently using Smart Mortgage's client database to solicit clients while employed with Defendant Nexa Mortgage.

91. Smart Mortgage and Nexa Mortgage are competitors in the residential mortgage loan brokerage industry.

92. Upon information and belief, Defendant Brian Noe unlawfully disclosed Smart Mortgage's trade secrets, that he had wrongfully copied from his Smart Mortgage company issued work computer.

93. Defendant Brian Noe left Smart Mortgage Centers for employment in a similar position with Defendant Nexa Mortgage.

94. Under these circumstances, given Defendant Brian Noe's prior employment with Smart Mortgage and his wrongful copying of Smart Mortgage's trade secrets, Defendant Nexa Mortgage's use of the trade secrets is evident in Defendant Brian Noe's closed transactions with Defendant Nexa Mortgage and can also be inferred under the "inevitable disclosure doctrine".

95. The Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., which was passed into law on
    May 11, 2016, specifically allows a private right of action for misappropriation of trade
    secrets.

96. Smart Mortgage is an owner of trade secrets, as defined by the Defend Trade Secrets Act
    which have been willfully misappropriated by Defendants Brian Noe and Nexa Mortgage.
    A person misappropriates a trade secret by, among other things, disclosing the trade secret
    despite knowing that it was acquired under circumstances giving rise to a duty to
    maintain its secrecy or limits its use or from a person who had a duty to maintain its
    secrecy or use.

97. Smart Mortgage took affirmative measures to keep its confidential and proprietary
    information secret.

98. Defendant Brian Noe received an offer of employment from Defendant Nexa Mortgage
    which he accepted.

99. Defendant Brian Noe signed an employment agreement with Smart Mortgage that included
    restrictive covenants concerning confidential information.

100. Defendant Brian Noe's computer at Smart Mortgage showed activity in which
    proprietary trade secret data and files were accessed and copied on December 20, 2019.

101. Smart Mortgage has no adequate remedy at law to protect against the illegal
    misappropriation and use of its trade secrets by Defendants Brian Noe and Nexa
    Mortgage. Injunctive relief is, therefore, necessary and appropriate to restrain the illegal
    misappropriation and use of such trade secrets and confidential information pursuant to
    the Defend Trade Secrets Act.

102. Unless Defendants Brian Noe and Nexa Mortgage are restrained and enjoined from using
Smart Mortgage's trade secrets and confidential information, Smart Mortgage
Centers will suffer immediate and irreparable injury in that Defendants Brian Noe and
Nexa Mortgage will continue to have access and the ability to make use of the trade
secrets and confidential information.

103. As a direct and proximate result of Defendants Brian Noe and Nexa Mortgage's actual and
threatened misappropriation of Smart Mortgage's trade secrets and confidential
information, Smart Mortgage has suffered damages in an amount yet to be determined.
Defendant Nexa Mortgage has been unjustly enriched. Pursuant to the Defense of Trade
Secrets Act, Smart Mortgage is entitled to recover damages. By reason of Defendants
Brian Noe and Nexa Mortgage's willful and malicious acts, Smart Mortgage is entitled to
an award of exemplary damages from Defendants Brian Noe and Nexa Mortgage in such
amounts as is necessary to punish Nexa Mortgage and Brian Noe and deter them from
commission of like acts and, in addition, reasonable attorneys' fees pursuant to the Defend
Trade Secrets Act.

## **PRAYER FOR RELIEF**

Smart Mortgage respectfully requests that the Court find in its favor and against
Defendants Brian Noe and Nexa Mortgage and that the Court grants Smart Mortgage the
following relief:

A.      Permanently enjoining Defendant Brian Noe and Defendant Nexa Mortgage and its
officers, directors, agents, servants, employees, affiliates, divisions, branches,
subsidiaries, parents and all others acting in concert or privity with any of them from
using Smart Mortgage's trade secrets;

B.     Awarding to Smart Mortgage the damages to which it is entitled for Defendant Brian
       Noe and Nexa Mortgage misappropriation of Smart Mortgage's trade secrets up until
       the Defendants are finally and permanently enjoined from further infringement,
       including compensatory damages, under the Defend Trade Secrets Act;

C.     Awarding to Smart Mortgage the attorneys' fees to which it is entitled for
       Defendants Brian Noe and Nexa Mortgage's misappropriation of Smart Mortgage's
       trade secrets;

D.     Awarding Smart Mortgage Centers costs and expenses in this action;

E.     Awarding Smart Mortgage Centers pre-and post-judgment interest on its
       damages; and

F.     Such other and further relief as the Court deems just and equitable.

Smart Mortgage hereby demands a trial by jury.


                                        For the Plaintiff

                                        Smart Mortgage Centers, Inc.


                                        By its attorney,
                                        s/Wilton A. Person

                                        _____

                                        Wilton A. Person


ARDC # 6290441
Wilton A. Person
Attorney for the Plaintiff Smart Mortgage Centers, Inc.
24330 Leski Lane
Plainfield, Illinois 60585
(815) 254-2467
wperson@personlaw.com

### LOAN OFFICER RETENTION AGREEMENT

This Loan Officer Retention Agreement (the "Agreement") establishing an employment relationship between **Smart Mortgage Centers, Inc.**, an Illinois Corporation ("Smart") and _____ *BRIAN W. ABE* _____ (the "Loan Officer"), is dated as of this ___*29*___ day of ___*OCTOBER*___, 2013.

**WHEREAS,** Smart is a licensee pursuant to the Illinois Residential Mortgage License Act of 1987 (the "Act") operating from its corporate offices at 1355 South RT 59, Suite 202, Naperville, Illinois 60564 (the "Home Office").

**WHEREAS,** Loan Officer has represented to Smart that he or she has experience and knowledge in the origination of residential mortgages;

**WHEREAS,** Smart seeks to employ Loan Officer for the purpose of assisting Smart in the performance of activities by the Act, including the origination of residential mortgage loans ("Loans"); and

**WHEREAS,** Loan Officer is willing to become an employee of Smart for the purpose of assisting Smart in the origination of residential mortgage loans;

**NOW, THEREFORE,** in consideration of the mutual covenants, herein contained, the sufficiency of which is acknowledged, it is agreed as follows:

1.     **APPLICATIONS:** Loan Officer shall take all Mortgage Loan applications in the name of Smart and on behalf of Smart, including all mandatory application and disclosure forms required by Smart, the Act, or pursuant to other regulatory, legal or lender requirements. Loan Officer acknowledges and understands that the customers, customer leads, customer files, customer names and customer mortgage applications and the related customer files and documents that he or she produces for Smart during his or her employment with Smart belong to and are the sole and exclusive property of Smart Mortgage Centers, Inc. and these items are not the property of the Loan Officer. Initial here: ___*W*___

2.     **REPRESENTATIONS:** (i) Loan Officer represents that he/she has read and has full knowledge of the Act, the other state and federal regulations affecting the residential mortgage industry ("Regulations") and agrees to operate fully within their purview, including but not limited to assisting only Smart in the performance of mortgage loan origination activities regulated by the Act and the Regulations; (ii) Loan Officer represents that he or she shall not enter into contracts (which relate in any way to this Agreement) with any person or entity

Exhibit A

without prior written consent of Smart; and (iii) Loan Officer shall act exclusively as a Loan Officer for Smart and shall not be affiliated with any other mortgage banker, broker or other lender, without the prior written consent of Smart.

3.    (a)    **RESPONSIBILITIES AND DUTIES:**    Loan Officer hereby accepts the following responsibilities and duties:

    a.    To perform to the best of his/her ability all duties assigned to him her by Smart and to carry out all Smart's policies and directives as described herein or as otherwise communicated to Loan Officer from time to time.

    b.    To perform to the best of his/her ability said duties in compliance with the Act, Regulations and all other applicable laws.

    c.    To fully comply with all state and federal laws, rules and regulations regarding the origination and processing of mortgage Loans.

    d.    To not become involved in any personal or business matter which may adversely affect or reflect upon Smart.

    e.    To attend all meetings, including Company policy and education meetings when required by Smart.

    f.    To not engage in any form of fraud or other illegal activity regarding the origination and processing of Loans, including Loan Officer's agreement not to mislead prospective customers or otherwise induce customers to commit fraud in the loan origination process.

    g.    To immediately lock in loan rates and terms at the customer directions.

    h.    To comply with all licensure and certification requirements mandated by applicable state or federal laws, at the expense of Loan Officer.

    i.    Loan Officer agrees and understands and agrees and understands that he or she is employed as an outside sales employee (see Schedule B).

    j.    "Counseling Services"

        i. Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.

        ii.    Collecting financial information (tax returns, bank statement, etc.) and other related documents that are part of the application process.

        iii.    Maintaining regular contact with the Borrower, Realtors, and Lenders between application and closing to apprise all parties of the status of the application and to gather any additional information as needed.

    k.    To perform all of the above duties on a professional basis and to interact with all Smart staff with professionalism and courtesy.

4.    **TERMS OF AGREEMENT:** This agreement shall remain in effect on a continuous basis from the date of this Agreement, unless terminated in accordance with the termination provisions hereinafter set forth.

5.    **TERMINATION:** This Agreement may be terminated: (1) without cause by thirty (30) days prior written notice by either party; (ii) immediately with cause upon a material breach of any term of this Agreement by either of the parties upon notice to the other party; (iii) immediately upon Loan Officer's violation of any provisions of the Act or other laws or regulations.    Upon such termination, Smart shall continue to process all mortgage loan applications taken by the Loan Officer for Smart though the date of such termination. Cause shall exist to immediately terminate this Agreement upon the Loan Officer's breach of the provisions of Paragraph Nine (9) hereof or any other breach of the terms hereof or of the policies of Smart, any of which breach(s) shall be considered a material breach of this Agreement. Loan Officer acknowledges that all customers, borrowers, Mortgage Loans originated, and all documentation generated in the name of Smart are the sole and exclusive property of Smart, and Loan Officer agrees not to make any claim for any ownership interest in either the customers, Mortgage Loans, leads purchased by Smart, customer loan files and/or the related documentation that he or she produced while employed by Smart. Loan Officer agrees that he/she shall not remove or withdraw any mortgage loan application(s) submitted by Smart to a mortgage banker/broker, and resubmit said loan(s) to another mortgage banker/broker, without the prior written consent of Smart.

6.    (b)    **DESCRIPTION OF FINANCIAL SERVICES:** Loan Officer will provide the following services:

   a.    Loan Officer agrees and understands that his or her duties include various services for Smart, such as collecting and analyzing information and data regarding all customer's income, assets, investments, or debts; determining and assessing which mortgage loan products best meet the customer's needs and financial considerations; advising the customer about the advantages and disadvantages of various mortgage loan products that the customer may qualify for; and marketing, servicing and promoting mortgage loan products made available through Smart from time to time;

   b.    Provide customary assistance in connection with the processing of Mortgage Loan applications for Smart;

   c.    Send Mortgage Loan applications for underwriting approval only to investors with whom Smart has entered into Correspondent Agreements (the "Investors");

     d.     Arrange and attend, if necessary the closing of said Mortgage Loans; and collect all monies due and owing to Smart, made payable only to Smart, and for deposit only by Smart, as a result of each completed Mortgage Loan transaction.

     e.     Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.

     f.     Assisting the Borrower in understanding and clearing credit problems.

7.    **DEPOSIT OF FUNDS:**  All funds or drafts received by Loan Officer during his employment at Smart, such as application deposits, appraisal fees, credit reporting fees, title charges, etc., shall be made payable only to Smart and shall immediately be delivered to Smart, to be deposited into Smart's "Operations Account" with documentation as to the source, use and disposition of said funds. To the extent reasonably feasible, the documentation submitted to Smart with each draft or check shall identify in writing the name of Smart's borrower(s). Loan Officer acknowledges that he/she shall be responsible for the collection of all fees in connection with mortgage Loans originated by Loan Officer, and, if not so collected by Loan Officer from Borrower at the time of Loan closing, then Smart shall the right to set off and deduct from any amounts due Loan Officer hereunder any amounts not paid, including but not limited to the above, and any shortages created by improperly processing said mortgage Loans; unpaid amounts due Smart; bounced Borrower(s) checks; any and all legal fees and costs relating to such matters; lender premium repayments for loans originated in violation of a lender's correspondent agreement with Smart and other items due Smart or third parties relating to Loan Officer, his or her Borrower(s) or otherwise.

All commission or other checks generated by closed Mortgage Loan transactions must be made payable to **"Smart Mortgage Centers, Inc."**, delivered to the Home Office, for deposit only by Smart into its "Operating Account", for allocation and payment by Smart. If Loan Officer deposits any above-described commission or other check(s) into an account that is controlled by Loan Officer or another person, and not by Smart, then such Loan Officer action shall constitute an immediate breach and termination of this Agreement, shall subject the Loan Officer to forfeiture of any and all amounts due Loan Officer hereunder, to immediate payment to Smart of any outstanding bills and invoices generated by Loan Officer; possible criminal investigation and civil action and fines.

8.    **COMPENSATION MATTERS:**  Smart agrees to make payments to Loan Officer in accordance with Schedule A attached hereto and incorporated by reference into this Agreement. Loan Officer agrees to make payments to Smart in accordance with the terms hereof. Loan Officer represents and warrants to Smart that if Loan officer is not entitled to a paycheck for any pay period that he did not render any services to Smart during that period. Smart reserves the

right to change the pay structure, see Schedule A, by giving the Loan Officer written notice of thirty (30) days.

9.     **EXCLUSIVITY:**   Loan Officer agrees that he/she shall not be affiliated with or otherwise perform any licensable services for: (i) any other licensee under the Act; or (ii) any other entity exempt from licensure under the Act; or (iii) any other entity that is required to become licensed under the Act but is not so licensed while this Agreement is in effect. Any breach of the provisions of this Paragraph Nine (9) shall be considered a material breach of this Agreement and shall be grounds for immediate termination of this Agreement.

10.     **ADVERTISING:**   All advertising proposed for use by Loan Officer must be pre-approved by Smart prior to its use. Advertising shall be deemed to include, but not limited to, advertisements in newspapers, magazines, other periodicals, radio spots, television commercials, computer bulletin boards and the Internet (a/k/a The World Wide Web), mailing pieces, business cards, etc. Smart shall approve or reject said advertising in a timely manner. All such advertising shall be on behalf of Smart and shall comply with applicable provisions of the Act and the Regulations. Advertising may include the name of the Loan Officer as an employee of Smart.

11.     **MUTUAL OBLIGATIONS OF LOAN OFFICER AND SMART:**   (i) Except for matters relating to mortgage loan originations for Smart consumers, Loan Officer does not have the authority to bind Smart contractually without the prior written consent of Smart; (ii) Loan Officer must utilize appraisers, credit reporting companies, title insurance companies and flood certification companies and other vendors approved by Smart or its correspondent lenders; and (iii) Loan Officer must submit to Smart's Processing Department all new mortgage loan applications on a daily basis within 24 hours of receipt.

12.     **HOLDBACK AND PAYMENT OF FUNDS UPON TERMINATION:** In the event this Agreement is terminated in accordance with the terms hereof, Smart shall have the right to withhold payment of any and all amounts due to Loan Officer for a period not to exceed sixty (60) days to ensure that all outstanding bills owed to Smart, to third-party vendors of Smart or otherwise; have been paid in full. If it is discovered that any obligation of the Loan Officer has not been paid which directly relates to a Mortgage Loan being processed or obligations owned to Smart, then, in that event, Smart shall pay such obligation on behalf of the Loan Officer: (i) first, from the funds withheld from Loan Officer, and (ii) in the event that such funds are insufficient, then, at Smart's election, from Smart's with reimbursement by Loan Officer to Smart. Loan Officer agrees and understands that he or she shall be entitled to fifty percent (50%) of the compensation set forth on Schedule A (Pay Plan) in the event of Loan Officer's voluntary termination of employment; and Loan Officer agrees that he or she not be entitled to any further

compensation from Smart if Loan Officer's employment is terminated for cause because Loan Officer engaged in any type or form of fraud in the loan settlement process; or otherwise breached the terms of this Agreement.

13.   **DELIVERY OF DOCUMENTATION:** Loan Officer agrees that upon entering into a Loan Brokerage Agreement (as defined in the Act) with a Borrower on behalf of Smart, Loan Officer shall immediately supply Smart with the originally signed copy of such agreement(s). Loan Officer further agrees that all pertinent data for each Mortgage Loan file produced for Smart shall be delivered to the Home Office of Smart within 24 hours of Loan Officer's receipt of same. Smart shall maintain said files in or under the control of the Home Office and these files may be made available for review by Loan Officer during regular business hours. Upon termination, it is the responsibility of the Loan Officer to deliver the keys to the Home Office by close of business that day. If not done, Loan Officer will be charged for the locks to be changed.

14.   **COMMISSIONER'S EXAMINATIONS:** Loan Officer acknowledges that Smart may be examined by the IDFPR, Office of Banks and Real Estate under the Act, FHA and/or Smart's independent auditors. Loan Officer agrees to cooperate fully with any and all such examinations and audits.

15.   **INDEMNIFICATION:** Loan Officer acknowledges that he/she is an agent of Smart, and accordingly, Smart may be accountable for certain acts or omissions of the Loan Officer occurring within the scope of the Loan Officer's authority under this Agreement. Smart may be liable to Borrowers of Smart, Investors and to certain third party vendors used by Loan Officer as a result of mortgage origination activities of Loan Officer. It is acknowledged by Loan Officer that Smart may be responsible for the acts of Loan Officer that are performed within the course of his/her duties and responsibilities, and Loan Officer hereby indemnifies, holds harmless and shall defend Smart and its officers, directors, shareholders, employees, agents and attorneys from any and all claims or demands of any kind regarding Loan Officer's alleged breach of the terms of this Agreement; any claims by any third party alleging a breach of covenants not to compete or otherwise; or any other matter. Loan Officer shall pay all legal fees, court costs, fines, penalties or other charges (e.g. filing fees, expert witness fees, etc.) relating to any litigation or other proceeding initiated by either a Borrower(s), lender, investor or any regulatory agency regarding Smart and/or Loan Officer, as shall be determined in the sole discretion of Smart.

In addition to any other remedies that the Lender may have, Loan Officer shall indemnify and hold Lender, its stockholders, affiliates and their respective officers, directors, employees and agents, harmless from and against, and shall reimburse it or them for, any losses, damages, deficiencies, claims, causes, of action or expenses of any nature (including reasonable attorney's fees) incurred at any time arising out of, in connection with or resulting from:

Notwithstanding anything in the Loan Officer Retention Agreement to the contrary, it is the intention of Smart Mortgage Centers, Inc. and Loan Officer under the Loan Officer Retention Agreement, ("Employee") that Employee's job duties and responsibilities, as set form in this Loan Officer Retention Agreement and Rider, qualify employee for the minimum wage and overtime pay exemption for outside sales employees set forth in section (a)(1) of the Fair Labor Standards Act ("FLSA"), and regulations promulgated there under. Employee understands and agrees that Employee's job duties and responsibilities are such that Employee will be exempt from the minimum wage and overtime pay requirements of the FLSA and therefore, Employee shall be treated by Employer as exempt from the minimum wage and overtime pay requirements of the FLSA and Illinois minimum wage and overtime laws.

Employee's job duties and responsibilities as a Loan Officer for Employer shall consist of the duties outlined in the Loan Officer Retention Agreement including this Rider some but not all of which are described as follows:

1. Employee's primary duty shall be the selling of mortgage loan products offered by Employer;
2. Employee shall meet with prospective borrowers, in person, to sell the mortgage loan products offered by Employer;
3. Employee shall be responsible for originating Employee's own sales by contacting prospective borrowers and by developing and maintaining referral sources;
4. Employee is expected to, and shall, spend a significant amount of time away from Employer's place of business in performing Employee's primary duty of selling the mortgage loan products offered by Employer;
5. Employee is expected to, and shall, meet with prospective borrowers at locations other than Employer's place of business, such as at the prospective borrower's home or other location away from Employer's place of business;
6. Employee's contact with prospective borrowers by telephone, mail or e-mail shall be adjunct to in-person contact with the prospective borrowers;
7. Employee shall obtain credit information and other necessary information and documentation from prospective borrowers for the loan application process;
8. Employee shall make in-person calls on real estate agents and brokers, financial advisor, and other potential referral sources to develop borrower leads;
9. Employee may also engage in marketing and promotional activities in support of Employee's own sales;

10. Employee shall have considerable flexibility in setting employee's own working hours and scheduling the tasks Employee performs during the work day;

11. Employee is expected to, and shall, customarily and regularly be engaged away from Employer's place of business;

12. Employee may spend some time in Employer's office taking loan applications, attending meetings, completing paperwork, preparing marketing and sales materials in support of Employee's own outside sales efforts; and

13. Additional tasks that may be performed at Employer's place of business may include checking and updating databases of loan products for sale and referral sources; calling, writing, or e-mailing borrowers or prospective borrowers with whom Employee has been dealing during Employee's outside sales activities; talking to borrowers or prospective borrowers in the office about their particular loan transaction; calling, writing, or e-mailing prospective borrowers or prospective referral sources with whom Employee may not have had prior contact; and preparing loan applications and other forms of loans initiated or negotiated by Employee during Employee's outside sales activities. Employer's place of business shall mean and include any office of Employer, as well as any fixed site, whether home or office, used by Employee as headquarters or for electronic or telephonic solicitation of sales, regardless of whether Employer is the owner or tenant of the property.

In performing the job duties and responsibilities set forth in this paragraph Loan Officer Retention Agreement and Rider, Employee shall abide by and fully comply with (i) any and all rules, policies, procedures and orders which Employer or Lender's Employer deals with may from time to time adopt or give; and (ii) all applicable federal, state, and local laws, statuses, regulation, rules and ordinances, as currently in effect or hereafter amended, including, but not limited to, the Truth and Lending Act ("TILA") and Regulation "Z" promulgated there under, the Real Estate Settlement Procedures Act ("RESPA") and Regulation "X" promulgated there under, and the Illinois Residential Mortgage License Act of 1987 ( the "Act") and all rules and/or regulations promulgated there under governing Employee's activities as a Loan Officer.

In Agreement herewith the parties have set their hand on the date next to their signature.

Smart Mortgage Centers, Inc.:                                          Employee:

_____ President                    _____
NAME                             TITLE

(a) Any misrepresentation made by Loan Officer, or in any schedule, exhibit, report, statement or certificate furnished by Loan Officer pursuant to this Agreement;

(b) The non-fulfillment or non-performance of any covenant, condition or action required of Loan Officer pursuant to this Agreement; or

(c) Any fraud in the preparation or delivery of any mortgage loan application file, known to Loan Officer or Broker, representative or agent of Broker.

(d) Loan Officer understands Smart has agreements with all Lenders that could have early payoff requirements. Loan Officer agrees not to solicit a Borrower for financing if a customer's loan was last financed with Smart and has a specified period of time that a Lender will ask for a yield spread premium to be refunded. Loan Officer agrees if this situation occurs that the Loan Officer will bring it to the attention of an Officer of Smart. If Loan Officer does finance a customer that Loan Officer will be responsible and liable to reimburse Smart for all costs and can be subject to termination.

16.    **CONFIDENTIALITY:** Loan Officer recognizes that Smart has and will have information such as customer names, customer lists, leads, customer files, mortgage loan documentation, and other confidential information regarding Smart's business operations ("Information"). Loan Officer agrees that Loan Officer will not, at any time nor in any manner, either directly or indirectly, use any "Information" for Loan Officer's own benefit, or divulge, disclose, or communicate in any manner any "Information" to any third party, without the prior written consent of Smart. Loan Officer will protect the "Information" and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement and shall entitle Smart to seek injunctive relief as well as damages.

Loan Officer agrees and acknowledges that he or she shall not do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart. Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by an Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart. Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

If it appears that Loan Officer has disclosed or has threatened to disclose "Information" in violation of this Agreement, Smart shall be entitled to an injunction to restrain Loan Officer from disclosing, in whole or in part, such "Information", or from providing any services to any party to whom such "Information" has been disclosed or may be disclosed. Smart shall not be

prohibited by this provision from pursuing any and all other remedies, including a claim for other losses and damages from Loan Officer.

This provision shall remain in full force and effect for a period of one (1) year after the termination of this Agreement.

17.     **RETURN OF RECORDS AND PROPERTY:** Upon termination of the Loan Officer's employment with Smart, Loan Officer, within twenty-four (24) hours, shall immediately deliver all customer names, customer files, records, notes, door keys, data (i.e. computer processing data) in his/her possession, or under Loan Officer's control that are Smart's property or relate to Smart's business.

18.     **EARLY LOAN PAYOFFS:** Loan Officer agrees that agreements are in place with Lenders, and if a loan pays off early with a Lender, even if that Loan Officer is not part of the pay-off, that the Loan Officer's commission will be collected and sent back to the Lender. Loan Officer agrees to check with Smart Mortgage Centers, Inc. on the policy for each Lender before soliciting the loan for refinancing or putting a customer in a loan knowing that the customer will pay off the loan in a specified period of time.

19.     **MISCELLANEOUS:**
     (a)     **AMENDMENT:** Neither this Agreement nor any term hereof may be amended, waived, discharged orally, but only by instrument in writing signed by each of the parties.
     (b)     **HEADINGS:** The headings in this Agreement are for convenience or reference only and shall not define or limit the provisions hereof.
     (c)     **APPLICABLE LAW:** This Agreement shall be construed in accordance with and governed by the Laws of the State of Illinois.
     (d)     **COUNTERPARTS:** This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which together shall constitute but one instrument.
     (e)     **JURISDICTION OF COURTS:** Any judicial proceedings between the parties under this Agreement shall be brought in the Circuit court of Dupage, Will or Cook County, Illinois.
     (f)     **PARTIES IN INTEREST:** All of the terms, covenants, and conditions herein contained shall inure to the benefit of and the binding upon the parties hereto, their heirs, successors and assigns.
     (g)     **NOTICES:** Notices under this Agreement shall be in writing and be personally delivered or sent by certified or registered mail, return receipt requested, to the parties at their addresses specified below or at such address designated in writing to all pursuant to this paragraph.

(h)     **SMART** reserves the right to revise commissions, processing fees, insurance fees and other matters upon fifteen (15) days prior written notice to Loan Officer.

(i)     **DISPUTES:** Loan Officer agrees that any disputes of the Loan Officer arising under this Agreement shall be handled through arbitration at the election of Smart. Loan Officer agrees that no litigation, suit or other proceeding shall be filed against Smart until such arbitration is concluded in all respects.

(j)     **EMPLOYEE CONTACT:**  Loan Officer shall not solicit, hire or otherwise induce any employee or consultant of Smart to terminate its employment or consulting relationship with Smart.   Loan Officer understands and agrees that it is difficult to compute the damages that Smart may incur if Loan Officer solicits, hires or otherwise induces an employee to terminate his or her employment with Smart.   Loan Officer agrees that this liquidated damages clause is reasonable and does not constitute a penalty. Loan Officer agrees that any violation of this provision shall subject Loan Officer to liquidated damages of $40,000 payable to Smart for each person who leaves Smart to either work for or become employed by the terminated Loan Officer or an entity associated with employs the terminated Loan Officer.   Loan Officer agrees that the liquidated damages of $40,000 are not a penalty and reasonably approximate the cost to recruit, train, and reimburse Smart Mortgage Centers, Inc. for the loss of each person's services to Smart.

(k)     **INTRODUCTORY PERIOD:** Your first sixty (60) days of employment at Smart is considered an Introductory Period, and during that period you will not accrue benefits available from the company, unless otherwise required by law, or unless otherwise provided in the applicable benefit plan document. This Introductory Period will be a time for getting to know your fellow employees, your manager/supervisor and the tasks involved in your job position, as well as becoming familiar with Smart's business.

    This Introductory Period is a try-out time for both of you, as an employee, and Smart, as an employer.  During this Introductory Period, Smart will evaluate your suitability for employment, and you can evaluate Smart as well.  At any time during this first sixty (60) days, you may resign without any detriment to your record.  If during this period, your work habits, attitude, attendance or performance do not measure up to our standards, we may discharge you.  If you take approved time off during the Introductory Period, the Introductory Period may be extended by that length of time.

    At the end of the Introductory Period, your manager/supervisor may discuss your job performance with you.  During the course of the discussion, you are encouraged to give your comments and ideas as well.  Please understand that completion of the

Introductory Period does not assure continued employment for any specified period of time.

(l)    **COMPANY VENDORS:**    If Loan Officer's employment with Smart shall terminate for any reason, then Loan Officer agrees not to contract or use the services of any vendor who provides services to Smart through the use of access code, account number, identifying number, password, user ID, or other code used by Smart, without the prior written consent of an authorized officer of Smart.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**Loan Officer**

_____
Name

_____
Address

_____
City/State/Zip

_____
Loan Officer's Signature

_____
Loan Officer's Social Security Number

**Smart Mortgage Centers, Inc..**

1355 South RT 59, Suite 202
Naperville, Illinois 60564
By:

_____

Its:    President

10/29/2013

**SCHEDULE B**

Outside Sales Employee Rider to Smart Mortgage Centers, Inc. Loan Officer Retention Agreement



**Loan Originator: Brian Noe - 228140**

Schedule "A" of Employee Retention Agreement

**Compensation Plan**

- Base compensation = 125 bps (based on a 250 bps contract)
- Base compensation = 100 bps (based on 200 bps contracts)
- Base compensation = 90 bps (based on 175 bps contracts)
- Base compensation = 75 bps (based on 150 bps contracts)
- Base compensation = 50 bps (based on a 100 bps contract)

**Production Bonus:**

Production bonus loan volume over 500,000 20 bps
Production bonus loan volume over 1,000,000 40 bps
Production bonus loan volume over 1,500,000 50 bps
Production bonus loan volume over 2,000,000 60 bps
Self Generated Business non-smart related +10 bps

**Administration Fee:**

- Loan Amount 130,000 and under = 130.00
- Loan Amount 130,000 and over = 395.00

**Reverse Mortgage = 50%**

Richard Birk 4/12/2014
Smart Mortgage Centers, Inc.
President

Printed Name: Brian Noe – NMLS 228140
4/12/2014
Signed

### LOAN OFFICER RETENTION AGREEMENT

This Loan Officer Retention Agreement (the "Agreement") establishing an employment relationship between Smart Mortgage Centers, Inc., an Illinois Corporation ("Smart") and _BRIAN W NOE_ (the "Loan Officer"), is dated as of this _1ST_ day of _JANUARY_, 2018.

WHEREAS, Smart is a licensee pursuant to the Illinois Residential Mortgage License Act of 1987 (the "Act") operating from its corporate offices at 4003 Plainfield/Naperville Rd., Suite 207, Naperville, Illinois 60564 (the "Home Office").

WHEREAS, Loan Officer has represented to Smart that he or she has experience and knowledge in the origination of residential mortgages;

WHEREAS, Smart seeks to employ Loan Officer for the purpose of assisting Smart in the performance of activities by the Act, including the origination of residential mortgage loans ("Loans"); and

WHEREAS, Loan Officer is willing to become an employee of Smart for the purpose of assisting Smart in the origination of residential mortgage loans;

NOW, THEREFORE, in consideration of the mutual covenants, herein contained, the sufficiency of which is acknowledged, it is agreed as follows:

1.    APPLICATIONS: Loan Officer shall take all Mortgage Loan applications in the name of Smart and on behalf of Smart, including all mandatory application and disclosure forms required by Smart, the Act, or pursuant to other regulatory, legal or lender requirements. Loan Officer acknowledges and understands that the customers, customer leads, customer files, customer names and customer mortgage applications and the related customer files and documents that he or she produces for Smart during his or her employment with Smart belong to and are the sole and exclusive property of Smart Mortgage Centers, Inc. and these items are not the property of the Loan Officer. Initial here:  _BN_

2.    REPRESENTATIONS: (i) Loan Officer represents that he/she has read and has full knowledge of the Act, the other state and federal regulations affecting the residential mortgage industry ("Regulations") and agrees to operate fully within their purview, including but not limited to assisting only Smart in the performance of mortgage loan origination activities regulated by the Act and the Regulations; (ii) Loan Officer represents that he or she shall not enter into contracts (which relate in any way to this Agreement) with any person or entity without prior written consent of Smart; and (iii) Loan Officer shall act exclusively as a Loan Officer for Smart and shall not be affiliated with any other mortgage banker, broker or other lender, without the prior written consent of Smart.

$\times$ _BN_

3.    (a)    RESPONSIBILITIES AND DUTIES:    Loan Officer hereby accepts the following responsibilities and duties:

a.    To perform to the best of his/her ability all duties assigned to him her by Smart and to carry out all Smart's policies and directives as described herein or as otherwise communicated to Loan Officer from time to time.

b.    To perform to the best of his/her ability said duties in compliance with the Act, Regulations and all other applicable laws.

c.    To fully comply with all state and federal laws, rules and regulations regarding the origination and processing of mortgage Loans.

d.    To not become involved in any personal or business matter which may adversely affect or reflect upon Smart.

e.    To attend all meetings, including Company policy and education meetings when required by Smart.

f.    To not engage in any form of fraud or other illegal activity regarding the origination and processing of Loans, including Loan Officer's agreement not to mislead prospective customers or otherwise induce customers to commit fraud in the loan origination process.

g.    To immediately lock in loan rates and terms at the customer directions.

h.    To comply with all licensure and certification requirements mandated by applicable state or federal laws, at the expense of Loan Officer.

i.    Loan Officer agrees and understands and agrees and understands that he or she is employed as an outside sales employee (see Schedule B).

j.    "Counseling Services"
    i. Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.
    ii.    Collecting financial information (tax returns, bank statement, etc.) and other related documents that are part of the application process.
    iii.    Maintaining regular contact with the Borrower, Realtors, and Lenders between application and closing to apprise all parties of the status of the application and to gather any additional information as needed.

k.    To perform all of the above duties on a professional basis and to interact with all Smart staff with professionalism and courtesy.

4.    TERMS OF AGREEMENT: This agreement shall remain in effect on a continuous basis from the date of this Agreement, unless terminated in accordance with the termination provisions hereinafter set forth.

5.    TERMINATION: This Agreement may be terminated: (1) without cause by thirty (30) days prior written notice by either party; (ii) immediately with cause upon a material breach of any term of this Agreement by either of the parties upon notice to the other party; (iii)

immediately upon Loan Officer's violation of any provisions of the Act or other laws or regulations. Upon such termination, Smart shall continue to process all mortgage loan applications taken by the Loan Officer for Smart through the date of such termination. Cause shall exist to immediately terminate this Agreement upon the Loan Officer's breach of the provisions of Paragraph Nine (9) hereof or any other breach of the terms hereof or of the policies of Smart, any of which breach(s) shall be considered a material breach of this Agreement. Loan Officer acknowledges that all customers, borrowers, Mortgage Loans originated, and all documentation generated in the name of Smart are the sole and exclusive property of Smart, and Loan Officer agrees not to make any claim for any ownership interest in either the customers, Mortgage Loans, leads purchased or generated by Smart, customer loan files and/or the related documentation that he or she produced while employed by Smart. Loan Officer agrees that he/she shall not remove or withdraw any mortgage loan application(s) submitted by Smart to a mortgage banker/broker, and resubmit said loan(s) to another mortgage banker/broker, without the prior written consent of Smart.

6.   (b)   DESCRIPTION OF FINANCIAL SERVICES: Loan Officer will provide the following services:

    a.   Loan Officer agrees and understands that his or her duties include various services for Smart, such as collecting and analyzing information and data regarding all customer's income, assets, investments, or debts; determining and assessing which mortgage loan products best meet the customer's needs and financial considerations; advising the customer about the advantages and disadvantages of various mortgage loan products that the customer may qualify for; and marketing, servicing and promoting mortgage loan products made available through Smart from time to time;

    b.   Provide customary assistance in connection with the processing of Mortgage Loan applications for Smart;

    c.   Send Mortgage Loan applications for underwriting approval only to investors with whom Smart has entered into Correspondent Agreements (the "Investors");

    d.   Arrange and attend, if necessary the closing of said Mortgage Loans; and collect all monies due and owing to Smart, made payable only to Smart, and for deposit only by Smart, as a result of each completed Mortgage Loan transaction.

    e.   Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.

    f.   Assisting the Borrower in understanding and clearing credit problems.

7.    DEPOSIT OF FUNDS: All funds or drafts received by Loan Officer during his employment at Smart, such as application deposits, appraisal fees, credit reporting fees, title charges, etc., shall be made payable only to Smart and shall immediately be delivered to Smart, to be deposited into Smart's "Operations Account" with documentation as to the source, use and disposition of said funds. To the extent reasonably feasible, the documentation submitted to Smart with each draft or check shall identify in writing the name of Smart's borrower(s). Loan

X AN

Officer acknowledges that he/she shall be responsible for the collection of all fees in connection with mortgage Loans originated by Loan Officer, and, if not so collected by Loan Officer from Borrower at the time of Loan closing, then Smart shall have the right to set off and deduct from any amounts due Loan Officer hereunder any amounts not paid, including but not limited to the above, and any shortages created by improperly processing said mortgage Loans; unpaid amounts due Smart; bounced Borrower(s) checks; any and all legal fees and costs relating to such matters; lender premium repayments for loans originated in violation of a lender's correspondent agreement with Smart and other items due Smart or third parties relating to Loan Officer, his or her Borrower(s) or otherwise.

All commission or other checks generated by closed Mortgage Loan transactions must be made payable to "Smart Mortgage Centers, Inc.", delivered to the Home Office, for deposit only by Smart into its "Operating Account", for allocation and payment by Smart. If Loan Officer deposits any above-described commission or other check(s) into an account that is controlled by Loan Officer or another person, and not by Smart, then such Loan Officer action shall constitute an immediate breach and termination of this Agreement, shall subject the Loan Officer to forfeiture of any and all amounts due Loan Officer hereunder, to immediate payment to Smart of any outstanding bills and invoices generated by Loan Officer; possible criminal investigation and civil action and fines.

8.      COMPENSATION MATTERS:  Smart agrees to make payments to Loan Officer in accordance with Schedule A attached hereto and incorporated by reference into this Agreement. Loan Officer agrees to make payments to Smart in accordance with the terms hereof. Loan Officer represents and warrants to Smart that if Loan officer is not entitled to a paycheck for any pay period that he did not render any services to Smart during that period. Smart reserves the right to change the pay structure, see Schedule A, by giving the Loan Officer written notice of thirty (30) days.

9.      EXCLUSIVITY:  Loan Officer agrees that he/she shall not be affiliated with or otherwise perform any licensable services for: (i) any other licensee under the Act; or (ii) any other entity exempt from licensure under the Act; or (iii) any other entity that is required to become licensed under the Act but is not so licensed while this Agreement is in effect. Any breach of the provisions of this Paragraph Nine (9) shall be considered a material breach of this Agreement and shall be grounds for immediate termination of this Agreement.

10.     ADVERTISING:  All advertising proposed for use by Loan Officer must be pre-approved by Smart prior to its use. Advertising shall be deemed to include, but not limited to, advertisements in newspapers, magazines, other periodicals, radio spots, television commercials, computer bulletin boards and the Internet (a/k/a The World Wide Web), mailing pieces, business cards, etc. Smart shall approve or reject said advertising in a timely manner. All such advertising shall be on behalf of Smart and shall comply with applicable provisions of the Act and the Regulations. Advertising may include the name of the Loan Officer as an employee of Smart.

X _GN_

11.     MUTUAL OBLIGATIONS OF LOAN OFFICER AND SMART:   (i) Except for matters relating to mortgage loan originations for Smart consumers, Loan Officer does not have the authority to bind Smart contractually without the prior written consent of Smart; (ii) Loan Officer must utilize appraisers, credit reporting companies, title insurance companies and flood certification companies and other vendors approved by Smart or its correspondent lenders; and (iii) Loan Officer must submit to Smart's Processing Department all new mortgage loan applications on a daily basis within 24 hours of receipt.

12.     HOLDBACK AND PAYMENT OF FUNDS UPON TERMINATION: In the event this Agreement is terminated in accordance with the terms hereof, Smart shall have the right to withhold payment of any and all amounts due to Loan Officer for a period not to exceed sixty (60) days to ensure that all outstanding bills owed to Smart, to third-party vendors of Smart or otherwise; have been paid in full. If it is discovered that any obligation of the Loan Officer has not been paid which directly relates to a Mortgage Loan being processed or obligations owed to Smart, then, in that event, Smart shall pay such obligation on behalf of the Loan Officer: (i) first, from the funds withheld from Loan Officer, and (ii) in the event that such funds are insufficient, then, at Smart's election, from Smart with reimbursement by Loan Officer to Smart. Loan Officer agrees and understands that he or she shall not be entitled to the compensation set forth on Schedule A (Pay Plan) in the event of Loan Officer's voluntary termination of employment; and Loan Officer agrees that he or she not be entitled to any further compensation from Smart if Loan Officer's employment is terminated for cause because Loan Officer engaged in any type or form of fraud in the loan settlement process; or otherwise breached the terms of this Agreement. In the event of an employee fine due to not following State and or Federal audit procedures: Money owed will be held until each late transaction withheld is cleared by State and or Federal Regulator's.  In some cases this can be every audit period (3 – 5 years).  In the event this agreement is terminated during this time fines will not be reimbursed.

13.     DELIVERY OF DOCUMENTATION:  Loan Officer agrees that upon entering into a Loan Brokerage Agreement (as defined in the Act) with a Borrower on behalf of Smart, Loan Officer shall immediately supply Smart with the originally signed copy of such agreement(s). Loan Officer further agrees that all pertinent data for each Mortgage Loan file produced for Smart shall be delivered to the Home Office of Smart within 24 hours of Loan Officer's receipt of same.  Smart shall maintain said files in or under the control of the Home Office and these files may be made available for review by Loan Officer during regular business hours. Upon termination, it is the responsibility of the Loan Officer to deliver the keys to the Home Office by close of business that day. If not done, Loan Officer will be charged for the locks to be changed.

14.     COMMISSIONER'S EXAMINATIONS:  Loan Officer acknowledges that Smart may be examined by the IDFPR, Office of Banks and Real Estate under the Act, FHA and/or Smart's independent auditors.  Loan Officer agrees to cooperate fully with any and all such examinations and audits.

                                                                    X  &N

15.    INDEMNIFICATION: Loan Officer acknowledges that he/she is an agent of Smart, and accordingly, Smart may be accountable for certain acts or omissions of the Loan Officer occurring within the scope of the Loan Officer's authority under this Agreement. Smart may be liable to Borrowers of Smart, Investors and to certain third party vendors used by Loan Officer as a result of mortgage origination activities of Loan Officer. It is acknowledged by Loan Officer that Smart may be responsible for the acts of Loan Officer that are performed within the course of his/her duties and responsibilities, and Loan Officer hereby indemnifies, holds harmless and shall defend Smart and its officers, directors, shareholders, employees, agents and attorneys from any and all claims or demands of any kind regarding Loan Officer's alleged breach of the terms of this Agreement; any claims by any third party alleging a breach of covenants not to compete or otherwise; or any other matter. Loan Officer shall pay all legal fees, court costs, fines, penalties or other charges (e.g. filing fees, expert witness fees, etc.) relating to any litigation or other proceeding initiated by either a Borrower(s), lender, investor or any regulatory agency regarding Smart and/or Loan Officer, as shall be determined in the sole discretion of Smart.

In addition to any other remedies that the Lender may have, Loan Officer shall indemnify and hold Lender, its stockholders, affiliates and their respective officers, directors, employees and agents, harmless from and against, and shall reimburse it or them for, any losses, damages, deficiencies, claims, causes, of action or expenses of any nature (including reasonable attorney's fees) incurred at any time arising out of, in connection with or resulting from:

(a) Any misrepresentation made by Loan Officer, or in any schedule, exhibit, report, statement or certificate furnished by Loan Officer pursuant to this Agreement;

(b) The non-fulfillment or non-performance of any covenant, condition or action required of Loan Officer pursuant to this Agreement; or

(c) Any fraud in the preparation or delivery of any mortgage loan application file, known to Loan Officer or Broker, representative or agent of Broker.

(d) Loan Officer understands Smart has agreements with all Lenders that could have early payoff requirements. Loan Officer agrees not to solicit a Borrower for financing if a customer's loan was last financed with Smart and has a specified period of time that a Lender will ask for a yield spread premium to be refunded. Loan Officer agrees if this situation occurs that the Loan Officer will bring it to the attention of an Officer of Smart. If Loan Officer does finance a customer that Loan Officer will be responsible and liable to reimburse Smart for all costs and can be subject to termination.

16.    CONFIDENTIALITY: Loan Officer recognizes that Smart has and will have information such as customer names, customer lists, leads, customer files, mortgage loan documentation, and other confidential information regarding Smart's business operations ("Information"). Loan Officer agrees that Loan Officer will not, at any time nor in any manner, either directly or indirectly, use any "Information" for Loan Officer's own benefit, or divulge, disclose, or communicate in any manner any "Information" to any third party, without the prior written consent of Smart. Loan Officer will protect the "Information" and treat it as strictly

X BN

confidential.  A violation of this paragraph shall be a material violation of this Agreement and shall entitle Smart to seek injunctive relief as well as damages.

Loan Officer agrees and acknowledges that he or she shall not do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart.  Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by a Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart.  Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

If it appears that Loan Officer has disclosed or has threatened to disclose "Information" in violation of this Agreement, Smart shall be entitled to an injunction to restrain Loan Officer from disclosing, in whole or in part, such "Information", or from providing any services to any party to whom such "Information" has been disclosed or may be disclosed.  Smart shall not be prohibited by this provision from pursuing any and all other remedies, including a claim for other losses and damages from Loan Officer.

This provision shall remain in full force and effect for a period of one (1) year after the termination of this Agreement.

17.     RETURN OF RECORDS AND PROPERTY: Upon termination of the Loan Officer's employment with Smart, Loan Officer, within twenty-four (24) hours, shall immediately deliver all customer names, customer files, records, notes, door keys, data (i.e. computer processing data) in his/her possession, or under Loan Officer's control that are Smart's property or relate to Smart's business.

18.     EARLY LOAN PAYOFFS:  Loan Officer agrees that agreements are in place with Lenders, and if a loan pays off early with a Lender, even if that Loan Officer is not part of the pay-off, that the Loan Officer's commission will be collected and sent back to the Lender.  Loan Officer agrees to check with Smart Mortgage Centers, Inc. on the policy for each Lender before soliciting the loan for refinancing or putting a customer in a loan knowing that the customer will pay off the loan in a specified period of time.

19.     MISCELLANEOUS:
(a)     AMENDMENT: Neither this Agreement nor any term hereof may be amended, waived, discharged orally, but only by instrument in writing signed by each of the parties.
(b)     HEADINGS: The headings in this Agreement are for convenience or reference only and shall not define or limit the provisions hereof.
(c)     APPLICABLE LAW: This Agreement shall be construed in accordance with and governed by the Laws of the State of Illinois.

X GN

(d)     COUNTERPARTS: This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which together shall constitute but one instrument.

(e)     JURISDICTION OF COURTS: Any judicial proceedings between the parties under this Agreement shall be brought in the Circuit court of Dupage, Will or Cook County, Illinois.

(f)     PARTIES IN INTEREST: All of the terms, covenants, and conditions herein contained shall inure to the benefit of and the binding upon the parties hereto, their heirs, successors and assigns.

(g)     NOTICES: Notices under this Agreement shall be in writing and be personally delivered or sent by certified or registered mail, return receipt requested, to the parties at their addresses specified below or at such address designated in writing to all pursuant to this paragraph.

(h)     SMART reserves the right to revise commissions, processing fees, insurance fees and other matters upon fifteen (15) days prior written notice to Loan Officer.

(i)     DISPUTES: Loan Officer agrees that any disputes of the Loan Officer arising under this Agreement shall be handled through arbitration at the election of Smart. Loan Officer agrees that no litigation, suit or other proceeding shall be filed against Smart until such arbitration is concluded in all respects.

(j)     EMPLOYEE CONTACT:  Loan Officer shall not solicit, hire or otherwise induce any employee or consultant of Smart to terminate its employment or consulting relationship with Smart.  Loan Officer understands and agrees that it is difficult to compute the damages that Smart may incur if Loan Officer solicits, hires or otherwise induces an employee to terminate his or her employment with Smart.  Loan Officer agrees that this liquidated damages clause is reasonable and does not constitute a penalty. Loan Officer agrees that any violation of this provision shall subject Loan Officer to liquidated damages of $50,000 payable to Smart for each person who leaves Smart to either work for or become employed by the terminated Loan Officer or an entity associated with employs the terminated Loan Officer.  Loan Officer agrees that the liquidated damages of $50,000 are not a penalty and reasonably approximate the cost to recruit, train, and reimburse Smart Mortgage Centers, Inc. for the loss of each person's services to Smart.

(k)     INTRODUCTORY PERIOD: Your first sixty (60) days of employment at Smart is considered an Introductory Period, and during that period you will not accrue benefits available from the company, unless otherwise required by law, or unless otherwise provided in the applicable benefit plan document.  This Introductory Period will be a time for getting to know your fellow employees, your manager/supervisor and the tasks involved in your job position, as well as becoming familiar with Smart's business.

This Introductory Period is a try-out time for both of you, as an employee, and Smart, as an employer.  During this Introductory Period. Smart will evaluate your suitability for employment, and you can evaluate Smart as well.  At any time during this

X GU

first sixty (60) days, you may resign without any detriment to your record.  If during this period, your work habits, attitude, attendance or performance do not measure up to our standards, we may discharge you.  If you take approved time off during the Introductory Period, the Introductory Period may be extended by that length of time.

At the end of the Introductory Period, your manager/supervisor may discuss your job performance with you.  During the course of the discussion, you are encouraged to give your comments and ideas as well.  Please understand that completion of the Introductory Period does not assure continued employment for any specified period of time.

(l)     COMPANY VENDORS:  If Loan Officer's employment with Smart shall terminate for any reason, then Loan Officer agrees not to contract or use the services of any vendor who provides services to Smart through the use of access code, account number, identifying number, password, user ID, or other code used by Smart, without the prior written consent of an authorized officer of Smart.

(m)    SECURITY/SURVEILLANCE:  All public area's in Suite 207 and Suite 201 are under video surveillance 24 hours/7 days per week.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Loan Officer/Processor                          Smart Mortgage Centers, Inc..

                                                4003 Plainfield/Naperville Rd., Suite 207
_____                         Naperville, Illinois 60564
Name                                            By:

_____                         _____
Address                                         Its:   President

_____
City/State/Zip                                  _____

_____
Loan Officer's Signature

_____
Loan Officer's Social Security Number



Loan Originator: Brian Noe – A Team

Schedule A – Plan A1

Based on 2.25 Lender Comp Plans.  If lender comp is different BPS payout will be adjusted accordingly.

As of 1/1/2018 Smart Mortgage Centers will no longer pay over 100 BPS on company generated leads until certain requirements are met.

Volume = 0 – 1,000,000

Company Leads – 100 BPS under 1,000,000 in Volume

Self-Generated – 130 BPS


Volume = 1,000,001 - Plus

Company Leads – 130 BPS

Self-Generated – 130 BPS


This is the pay plan that I'm accepting as of DATE: __01__ / __01__ / __2018__

Brian Noe NMLS #228140 – Signature _____

Richard Birk - President/Witness – Signature _____

Employee Retention Agreement Disclaimer:  Smart Mortgage Centers reserves the right to change the pay structure by giving you written notice of 30 days.

SCHEDULE B

Outside Sales Employee Rider to Smart Mortgage Centers, Inc. Loan Officer Retention Agreement

Notwithstanding anything in the Loan Officer Retention Agreement to the contrary, it is the intention of Smart Mortgage Centers, Inc. and Loan Officer under the Loan Officer Retention Agreement, ("Employee") that Employee's job duties and responsibilities, as set form in this Loan Officer Retention Agreement and Rider, qualify employee for the minimum wage and overtime pay exemption for outside sales employees set forth in section (a)(1) of the Fair Labor Standards Act ("FLSA"), and regulations promulgated there under. Employee understands and agrees that Employee's job duties and responsibilities are such that Employee will be exempt from the minimum wage and overtime pay requirements of the FLSA and therefore, Employee shall be treated by Employer as exempt from the minimum wage and overtime pay requirements of the FLSA and Illinois minimum wage and overtime laws.

Employee's job duties and responsibilities as a Loan Officer for Employer shall consist of the duties outlined in the Loan Officer Retention Agreement including this Rider some but not all of which are described as follows:

1. Employee's primary duty shall be the selling of mortgage loan products offered by Employer;
2. Employee shall meet with prospective borrowers, in person, to sell the mortgage loan products offered by Employer;
3. Employee shall be responsible for originating Employee's own sales by contacting prospective borrowers and by developing and maintaining referral sources;
4. Employee is expected to, and shall, spend a significant amount of time away from Employer's place of business in performing Employee's primary duty of selling the mortgage loan products offered by Employer;
5. Employee is expected to, and shall, meet with prospective borrowers at locations other than Employer's place of business, such as at the prospective borrower's home or other location away from Employer's place of business;
6. Employee's contact with prospective borrowers by telephone, mail or e-mail shall be adjunct to in-person contact with the prospective borrowers;
7. Employee shall obtain credit information and other necessary information and documentation from prospective borrowers for the loan application process;



8. Employee shall make in-person calls on real estate agents and brokers, financial advisor, and other potential referral sources to develop borrower leads;

9. Employee may also engage in marketing and promotional activities in support of Employee's own sales;

10. Employee shall have considerable flexibility in setting employee's own working hours and scheduling the tasks Employee performs during the work day;

11. Employee is expected to, and shall, customarily and regularly be engaged away from Employer's place of business;

12. Employee may spend some time in Employer's office taking loan applications, attending meetings, completing paperwork, preparing marketing and sales materials in support of Employee's own outside sales efforts; and

13. Additional tasks that may be performed at Employer's place of business may include checking and updating databases of loan products for sale and referral sources; calling, writing, or e-mailing borrowers or prospective borrowers with whom Employee has been dealing during Employee's outside sales activities; talking to borrowers or prospective borrowers in the office about their particular loan transaction; calling, writing, or e-mailing prospective borrowers or prospective referral sources with whom Employee may not have had prior contact; and preparing loan applications and other forms of loans initiated or negotiated by Employee during Employee's outside sales activities. Employer's place of business shall mean and include any office of Employer, as well as any fixed site, whether home or office, used by Employee as headquarters or for electronic or telephonic solicitation of sales, regardless of whether Employer is the owner or tenant of the property.

In performing the job duties and responsibilities set forth in this paragraph Loan Officer Retention Agreement and Rider, Employee shall abide by and fully comply with (i) any and all rules, policies, procedures and orders which Employer or Lender's Employer deals with may from time to time adopt or give; and (ii) all applicable federal, state, and local laws, statuses, regulation, rules and ordinances, as currently in effect or hereafter amended, including, but not limited to, the Truth and Lending Act ("TILA") and Regulation "Z" promulgated there under, the Real Estate Settlement Procedures Act ("RESPA") and Regulation "X" promulgated there under, and the Illinois Residential Mortgage License Act of 1987 ( the "Act") and all rules and/or regulations promulgated there under governing Employee's activities as a Loan Officer.

In Agreement herewith the parties have set their hand on the date next to their signature.

Smart Mortgage Centers, Inc.:

NAME _____  President
TITLE

Employee:

_____

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SMART MORTGAGE CENTERS, INC.,

        Plaintiff,

        vs.

BRIAN NOE, EILEEN PRUITT, NEXA
MORTGAGE, LLC, and SECURED
MORTGAGE PROCESSING, LLC

        Defendants,

Case no. 20-cv-07248

## AMENDED COMPLAINT

Plaintiff Smart Mortgage Centers, Inc. ("Smart Mortgage"), by and through its undersigned

counsel, files this Amended Complaint for misappropriation of trade secrets against Defendant

Brian Noe ("Noe"), Defendant Eileen Pruitt, ("Pruitt'), Defendant Nexa Mortgage LLC ("Nexa

Mortgage") and Defendant Secured Mortgage Processing, LLC ("Secured Mortgage

Processing") and violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030 et al.

against Defendants Brian Noe and Eileen Pruitt, and hereby alleges as follows:

## NATURE OF THE ACTION

### I.    PARTIES

1. Plaintiff Smart Mortgage is a corporation formed under the laws of the State of Illinois
   with its principal place of business at 4003 Plainfield Naperville Road, Suite 207, Naperville,
   Illinois 60564.

2. Defendants Brian Noe is an individual residing within the Northern District of Illinois.

3. Defendant Eileen Pruitt is an individual residing within the Northern District of Illinois.

4. Defendant, Nexa Mortgage is an Arizona limited liability company in good standing that
   provides mortgage services and products to consumers in several states and within the
   Northern District of Illinois.

5.  Defendant, Secured Mortgage Processing, LLC, is an Arizona limited liability company in
    good standing that provides mortgage loan processing services to mortgage brokers including
    Defendant Nexa Mortgage.

## II.   JURISDICTION AND VENUE

6.  Jurisdiction over this cause is based upon 28 U.S.C. Sections 1331.

7.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that Plaintiff resides in
    this judicial district and all or a substantial part of the events or omissions giving rise to the
    claims occurred within this judicial district.

8.  This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq and
    Computer Fraud and Abuse Act, 18 U.S.C. §1030 et al.  This Court has subject matter
    jurisdiction over this case for misappropriation of trade secrets under the Defend Trade
    Secrets Act of 2016 and the Computer Fraud and Abuse Act, 18 U.S.C. §1030 et al. pursuant
    to 28 U.S.C. §§ 1331 and 1338(a) with respect to the Defend Trade Secrets Act of 2016.

## FACTUAL BACKGROUND

9.  On October 29, 2013, Defendant Brian Noe began employment with Smart Mortgage as a
    loan officer.

10. On October 29, 2013, Defendant Brian Noe signed a Loan Officer Retention Agreement
    with Smart Mortgage. See Exhibit A.

11. On April 12, 2014, Defendant Brian Noe and Smart Mortgage finalized the compensation
    package related to the October 29, 2013 Loan Officer Retention Agreement. See Exhibit A.

12. On January 1, 2018, Defendant Brian Noe signed a Loan Officer Retention Agreement with
    Smart Mortgage. See Exhibit B.

13. The January 1, 2018 Loan Officer Retention Agreement increased Defendant Brian Noe's
    financial compensation with Smart Mortgage. See Exhibit B.

14. On May 6, 2019, Defendant Eileen Pruitt began employment with Smart Mortgage as a loan officer.

15. On May 6, 2019, Defendant Eileen Pruitt signed a Loan Officer Retention Agreement with Smart Mortgage. See Exhibit C.

16. On February 20, 2019, Defendant Brian Noe requested and was provided Smart Mortgage's closed loan log for files he handled as a Smart Mortgage loan officer from October 29, 2013 to February 20, 2019.

17. Smart Mortgage's closed loan log was provided to Defendant Brian Noe by Smart Mortgage's operations manager, Jon Butusov, via email on February 20, 2019.

18. On November 22, 2019, Defendant Brian Noe submitted his final two loan applications as a Smart Mortgage employee.

19. On December 19, 2019, Defendant Brian Noe closed his final loan as a Smart Mortgage employee.

20. On December 20, 2019, Defendant Brian Noe tendered his resignation to Smart Mortgage without returning his closed loan log to Smart Mortgage.

21. On February 1, 2018, Defendant Brian Noe downloaded the Dropbox Software Application on his Smart Mortgage company computer without authorization or consent from Smart Mortgage.

22. On December 20, 2019, Defendant Brian Noe accessed and downloaded information from Smart Mortgage's client database as discovered by an audit conducted from January 17, 2020 to February 8, 2020 by Smart Mortgage's Information Technology manager Paul Stretavong.

23. On December 20, 2019, Defendant Brian Noe changed his password and deleted all files on his Smart Mortgage company computer.

24. Upon reviewing Defendant Brian Noe's company computer, Paul Stretavong discovered that
    Defendant Brian Noe had recently deleted all of the files from his company computer's
    hard drive.

25. Defendant Brian Noe remained employed with Smart Mortgage from October 29, 2013 to
    December 20, 2019.

26. On December 21, 2019, Cynthia Pedraza sent personal documents to Defendant Brian Noe
    via Smart Mortgage's email address, briannoe@smartmtgs.net, for the purpose of obtaining
    a mortgage for John Munoz.

27. John Munoz's personal information is stored in Smart Mortgage's client database.

28. On December 22, 2019, Cynthia Pedraza sent John Munoz's personal documents to
    Defendant Brian Noe via Smart Mortgage's email address briannoe@smartmtgs.net for the
    purpose of obtaining a mortgage for John Munoz.

29. On December 25, 2019, Kenneth Barber emailed Defendant Brian Noe via Smart
    Mortgage's email address briannoe@smartmtgs.net to inquire whether his refinance could be
    initiated in January 2020 to allow him to skip February and March 2020 mortgage payments.

30. Kenneth Barber's personal information is stored in Smart Mortgage's client database.

31. On December 26, 2019, Defendant Brian Noe began his employment with Defendant Nexa
    Mortgage.

32. On December 30, 2019, Defendant Brian Noe sent an unsolicited text to William Jovel and
    advised him that he had changed mortgage companies and that he had all of his past
    information.

33. William Jovel's personal information is stored in Smart Mortgage's client database.

34. On December 30, 2019 and continuing to the present, Defendant Brian Noe has solicited and
    offered mortgage services to multiple individuals from Smart Mortgage's client database.

35. On February 2, 2020, Defendant Eileen Pruitt tendered her resignation to Smart Mortgage.

36. On February 3. 2020, Defendant Eileen Pruitt solicited and offered mortgage services to Larissa Fowler.

37. Larissa Fowler's personal information is stored in Smart Mortgage's client database.

38. On February 2, 2020, Defendant Eileen Pruitt changed her password and deleted all files on her Smart Mortgage company computer.

39. Smart Mortgage derives economic value from its client database because the database exclusively contains individuals who have specifically sought mortgage services with Smart Mortgage.

40. Smart Mortgage's client database was created with the investment of substantial expenditures, skills, sweat equity, and time.

41. Smart Mortgage regularly and routinely enters into contracts with several lenders including but not limited to United Wholesale Mortgage, PRMG, Inc, Home Point Financial Corporation, Union Home Mortgage Corp., Oaktree Funding Corp., Carrington Mortgage, Bayview Financial, and Flagstar Bank that purchase loans originated by Smart Mortgage.

42. Defendants Brian Noe, Eileen Pruitt and Nexa Mortgage are actively soliciting Smart Mortgage borrowers seeking to refinance their existing loans or obtain new purchase loans with Smart Mortgage, thereby interfering with Smart Mortgage's contracts and prospective advantage with the loan purchasers.

43. As a result of Defendant Brian Noe's breach of Smart Mortgage's client database, Smart Mortgage sent a cease-and-desist letter to both Defendant Brian Noe and Defendant Nexa Mortgage on January 20, 2020.

44. As a result of the Defendant Brian Noe's breach of Smart Mortgage's client database, Smart Mortgage sent letters to all Smart Mortgage clients who may have been impacted by Defendant Brian Noe's misappropriation of Smart Mortgage customer's confidential and personal identifying information in early February of 2020.

45. Smart Mortgage has received numerous calls from Smart Mortgage customers concerned that their personal identifying information is compromised.

46. Defendant Nexa Mortgage loan originators primarily use Defendant Secured Mortgage Processing's mortgage loan processing services.

47. Defendant Secured Mortgage Processing was originally formed as Nexa Mortgage Processing, LLC on February 19, 2018.

48. Mathew Grella and Michael Kortas were members of Nexa Mortgage Processing, LLC until October 2, 2018.

49. Mathew Grella and Michael Kortas are listed as the two LLC members of Defendant Nexa Mortgage, LLC with the Arizona Corporation Commission.

50. On October 3, 2018, Nexa Mortgage Processing, LLC's name was changed to Secured Mortgage Processing, LLC, Edna Montijo, the spouse of Michael Kortas, was added as the sole member manager of Defendant Secured Mortgage Processing, and Mathew Grella, Michael Kortas, and Sam Stockham were removed as members of the newly formed Secured Mortgage Processing, LLC.

51. Defendant Nexa Mortgage receives compensation on behalf of Defendant Secured Mortgage Processing, LLC in states that Defendant Secured Mortgage Processing is not licensed.

52. Defendant Brian Noe used Defendant Secured Mortgage Processing to process loans with Smart Mortgage's client data.

53. Defendant Secured Mortgage Processing, LLC implemented a policy and practice that required its processors to upload consumer's personal identifying information including but not limited to name, address, phone number, email address, and birthdate to BNTouch, Inc. under the BNTouch Mortgage CRM master account and password of Michael Kortas.

54. Defendant Secured Mortgage Processing, LLC's policy and practice to upload consumer's personal identifying information including but not limited to name, address, phone number, email address, and birthdate to BNTouch, Inc. was applicable to both Nexa Mortgage, LLC and mortgage broker companies not affiliated with Nexa Mortgage, LLC.

55. Defendant Secured Mortgage Processing, LLC processors would only be paid if the processor uploaded consumers' personal identifying information including but not limited to name, address, phone number, email address, and birthdate to BNTOUCH, Inc. under the BNTOUCH Mortgage CRM master account and password of Mike Kortas.

56. Michael Kortas conducts weekly Monday trainings for Defendant Secured Mortgage Processing, LLC processors.

57. Michael Kortas arranges "Zoom Happy Hours" between Nexa Mortgage, LLC and Secured Mortgage Processing, LLC.

58. Michael Kortas actively controls Defendant Secured Mortgage Processing, LLC including but not limiting to directing its policies and practices, hiring and firing personnel, conducting weekly training, and deciding compensation matters.

59. That Michael Kortas knew or should have known that Smart Mortgage Center's client database was being misappropriated by Defendant Secured Mortgage Processing.

60. Accordingly, the Defendants have caused irreparable harm to Smart Mortgage's business reputation with the impacted customers.

## BASIS OF CLAIMS

61. Defendants have misappropriated Smart Mortgage's client database in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq.

62. Defendants Brian Noe, Nexa Mortgage, Secured Mortgage Processing have financially benefited from its continued use of Smart Mortgage's client database to market and sell mortgage loan services and products.

## COUNT I

### Violation of The Defend Trade Secrets Act of 2016

Plaintiff sues all Defendants and alleges:

63. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-62 above as if each were more fully set forth herein.

64. Smart Mortgage is a leading mortgage loan broker currently operating in Illinois, Indiana, Colorado, Florida, and Virginia and provides loan solutions to its clients based on their individual preferences and needs.

65. Smart Mortgage provides its clients with access to a diverse range of lenders and financial products.

66. The mortgage loan brokerage business is highly competitive and Smart Mortgage's success depends on numerous factors, including its ability to generate client leads, attract and retain reliable and trustworthy loan originators as well as support personnel to obtain and maintain Smart Mortgage's client relationships.

67. Smart Mortgage's client database contains over thirty-eight hundred (3800) unique client names as well as unique client names for closed loans, denied loans, and archived records not known or available to the general public with personal identifying information, historical client transaction information, client preferences, and personalized notes.

68. Smart Mortgage's client database is used in or intended for use in interstate commerce as Smart Mortgage operates in Illinois, Indiana, Colorado, Florida, and Virginia.

69. Competitors would gain an immediate and substantial advantage by accessing Smart Mortgage's client database because the competitors would not be required to create an independent solution via its own efforts and expense.

70. Smart Mortgage invests significant financial resources in its business operations to maintain its competitive advantage and expand its client relationships.

71. Smart Mortgage has a number of policies, procedures, and agreements that it uses to protect its trade secret and confidential information, and safeguard its client relationships.

72. Smart Mortgage owns all of the computers used for its business operations.

73. Smart Mortgage does not employ portable data drives or allow employees to create new files to access and remove data from its computer systems.

74. Smart Mortgage prohibits third party software applications such as Dropbox or similar software applications to access or remove data from its computer systems.

75. Smart Mortgage's client database cannot readily be duplicated from any public sources.

76. Defendants would not have any ability to duplicate Smart Mortgage's client database or develop a comparable independent solution without spending hundreds of thousands of dollars and decades developing a similar client database.

77. Smart Mortgage's client database provides it a competitive advantage in the residential mortgage loan brokerage industry because it is able to generate client leads exclusive to Smart Mortgage and the client database contains historical client transaction information, client preferences, and personalized notes.

78. This ability to generate client leads exclusive to Smart Mortgage loan officers is the linchpin of Smart Mortgage's competitive advantage in the residential mortgage loan brokerage industry.

79. Smart Mortgage's client database was developed over a twenty-year period.

80. Smart Mortgage has invested hundreds of thousands of dollars over a twenty-year period to develop its client database.

81. Smart Mortgage's client database is not available to the general public or its competitors.

82. Smart Mortgage's client database access is restricted to a limited number of employees.

83. Smart Mortgage's client database access is password protected.

84. Smart Mortgage's loan officers are limited to accessing only client data related to files that have been specifically assigned to that particular loan officer.

85. Each loan officer's computer, loan origination software, lead management software is password protected.

86. Smart Mortgage's client database restricts any loan officer from deleting client information.

87. Smart Mortgage's client database is stored on a secure virtual private network and local private network which limits loan officers' access to only their assigned client files.

88. Smart Mortgage prohibits employees from downloading third-party software on their company issued work computers.

89. Smart Mortgage requires all of its loan officers to sign Loan Officer Retention Agreements and obligates the loan officer to return all client lists and company property upon leaving the company.

90. Smart Mortgage's client database was misappropriated by all Defendants.

91. All Defendants knew or had reason to know that the misappropriation was acquired through improper means.

92. Defendant Brian Noe solicited clients from Smart Mortgage's client database despite agreeing that he acknowledged and understood that the customers, customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents that he produced for Smart Mortgage during his employment were the sole and exclusive property of Smart Mortgage.

93. Upon information and belief, Defendant Eileen Pruitt solicited additional clients from Smart Mortgage's client database beyond Larissa Fowler despite agreeing that she acknowledged and understood that the customers, customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents that she produced for Smart Mortgage during her employment were the sole and exclusive property of Smart Mortgage.

94. Defendant Eileen Pruitt misappropriated customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents from Smart Mortgage at or near the time of her resignation from Smart Mortgage on February 2, 2020.

95. Defendant Brian Noe misappropriated customer leads, customer files, customer names, and customer mortgage applications and related customer files and documents from Smart Mortgage at or near the time of his resignation from Smart Mortgage on December 20, 2019.

96. Defendant Nexa Mortgage acquired and used information provided by Defendant Brian Noe to solicit its residential mortgage clients despite knowing or having reason to know that Defendant Brian Noe acquired the information through improper means and without the consent of Smart Mortgage after receiving a "cease and desist" letter providing written notice of Defendant Brian Noe's unlawful actions and/or a cursory review of Defendant Brian Noe's closed transactions with Defendant Nexa Mortgage.

97. Defendant Secured Mortgage Processing acquired and used information provided by
    Defendant Brian Noe to upload consumer's personal identifying information including but
    not limited to name, address, phone number, email address, and birthdate to BNTouch, Inc.
    under the BNTouch Mortgage CRM master account and password of Michael Kortas
    despite knowing or having reason to know that Defendant Brian Noe acquired the
    information through improper means and without the consent of Smart Mortgage.

98. Upon information and belief, Defendant Nexa Mortgage acquired and used information
    provided by Defendant Brian Noe to solicit residential mortgage customers despite knowing
    or reason to know that the trade secret was acquired by improper means because it
    encouraged Defendant Brian Noe to bring his "book of business" to Nexa Mortgage.

99. Upon information and belief, Defendant Brian Noe has willfully and maliciously
    misappropriated Smart Mortgage's client database containing over thirty-eight hundred
    (3800) unique client names as well as unique client names for closed loans, denied loans, and
    archived records with personal identifying information, historical client transaction
    information, client preferences, and personalized notes by copying and creating files of Smart
    Mortgage's trade secret and confidential information.

100. Upon information and belief, Defendant Eileen Pruitt has willfully and maliciously
    misappropriated Smart Mortgage's client database containing over thirty-eight hundred
    (3800) unique client names as well as unique client names for closed loans, denied loans, and
    archived records with personal identifying information, historical client transaction
    information, client preferences, and personalized notes by copying and creating files of Smart
    Mortgage's trade secret and confidential information.

101. Smart Mortgage's client database is currently being used by Defendants for their
    financial benefit.

102. As a direct and proximate result of the actions of Defendants, Smart Mortgage has suffered actual and compensatory damages in an undetermined amount.

103. To protect its business interests and the confidentiality of business operations, Smart Mortgage has taken affirmative measures, including the utilization of restrictive covenants in its employment contracts, requiring computer username and password protection, incorporating firewalls to limit access and safeguard information, and restricting unauthorized use of client data.

104. The restrictive covenants in Smart Mortgage's loan retention agreements are negotiated with each employee as part of their employment and include any combination of clauses concerning confidential information. Each restrictive covenant is limited in scope to protect both Smart Mortgage's legitimate business interests while preventing undue hardship on the employee in his or her pursuit of employment in his or her area of expertise.

105. Defendant Nexa Mortgage knew or should have known that the employees they hired from Smart Mortgage Centers would be covered by employment contracts with restrictive covenants.

106. Upon information and belief, Defendant Nexa Mortgage encouraged Defendant Brian Noe prior to his resignation from his loan officer position at Smart Mortgage as well after he resigned from his loan officer position at Smart Mortgage Centers to engage in unfair and unlawful competition with Smart Mortgage.

107. Defendants have used and disclosed Smart Mortgage Center's trade secrets and confidential information in violation of Federal law.

108. As a condition of employment, Defendants Brian Noe and Eileen Pruitt signed employment agreements with Smart Mortgage. This agreement contained several restrictive covenants, including clauses related to confidential information.

109. As loan officers at Smart Mortgage, Defendant Brian Noe's duties and Defendant Eileen
   Pruitt's duties to Smart Mortgage Centers included but were not limited to: (i) performing to
   the best of their abilities all duties assigned to them by Smart Mortgage and to carry out all
   Smart Mortgage's policies and directives as described in the Loan Officer Retention
   Agreement; (ii) to fully comply with all state and federal laws, rules and regulations
   regarding the origination and processing of mortgage loans, (iii) to perform to the best of
   their abilities said duties in compliance with all Acts and regulations affecting the
   residential mortgage industry, and (iv) to not use any confidential information regarding
   Smart Mortgage's business operations for their own benefit, or divulge, disclose, or
   communicate this information to any third party, without the prior written consent of Smart
   Mortgage.

110. In the restrictive covenants in their employment agreements, including those concerning
   confidential information, Defendants Brian Noe and Eileen Pruitt agreed that Smart
   Mortgage's customers, customer leads, customer files, customer names, and customer
   mortgage applications and related customer files and documents that they produced for
   Smart Mortgage during their employment were the sole and exclusive property of Smart
   Mortgage.

111. Defendants Brian Noe and Eileen Pruitt agreed that they would follow this and other
   restrictive covenants regarding Smart Mortgage's trade secrets and confidential business
   information during their employment with Smart Mortgage Centers and for as long as the
   confidentiality of trade secrets and proprietary business information were to be maintained
   under applicable law.

112. Defendant Brian Noe's agreements to abide by the restrictive covenants were supported by adequate consideration, which consisted of his accepting and continuing his employment and an increase in his compensation.

113. Defendant Eileen Pruitt's agreement to abide by the restrictive covenants were supported by adequate consideration, which included her accepting and continuing her employment.

114. The restrictive covenants in their employment agreements were fair, reasonable, and necessary for the protection of Smart Mortgage's legitimate business interests.

115. During their employment with Smart Mortgage, Defendants Brian Noe and Eileen Pruitt had access to all of Smart Mortgage's trade secrets and confidential business information via their company issued work computers.

116. Defendant Brian Noe's company issued work computer was user and password protected, as well as protected by other measures, including a firewall.

117. Defendant Eileen Pruitt's company issued work computer was user and password protected, as well as protected by other measures, including a firewall.

118. Upon information and belief, Defendant Brian Noe accessed and copied Smart Mortgage's client database on and prior to December 20, 2019.

119. Upon information and belief, Defendant Eileen Pruitt accessed and copied Smart Mortgage's client database information on and prior to February 2, 2020.

120. Defendants Brian Noe and Eileen Pruitt are currently using Smart Mortgage's client database to solicit clients while employed with Defendant Nexa Mortgage.

121. Upon information and belief, Defendant Eileen Pruitt has used Smart Mortgage's client database to solicit clients while employed with Defendant Nexa Mortgage.

122. Smart Mortgage and Nexa Mortgage are competitors in the residential mortgage loan
     brokerage industry.

123. Upon information and belief, Defendant Brian Noe unlawfully disclosed Smart Mortgage's
     trade secrets, that he had wrongfully copied from his Smart Mortgage company issued
     work computer.

124. Upon information and belief, Defendant Eileen Pruitt unlawfully disclosed Smart
     Mortgage's trade secrets, that she had wrongfully copied from his Smart Mortgage
     company issued work computer.

125. Both Defendants Brian Noe and Eileen Pruitt left Smart Mortgage Centers for employment
     in similar positions with Defendant Nexa Mortgage.

126. Under these circumstances, given Defendant Brian Noe's prior employment with Smart
     Mortgage and his wrongful copying of Smart Mortgage's trade secrets, Defendant Nexa
     Mortgage's use of the trade secrets is evident in Defendant Brian Noe's closed transactions
     with Defendant Nexa Mortgage and can also be inferred under the "inevitable disclosure
     doctrine".

127. The Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., which was passed into law on
     May 11, 2016, specifically allows a private right of action for misappropriation of trade
     secrets.

128. Smart Mortgage is an owner of trade secrets, as defined by the Defend Trade Secrets Act
     which have been willfully misappropriated by Defendants Brian Noe, Eileen Pruitt, Nexa
     Mortgage, and Secured Mortgage Processing. A person misappropriates a trade secret by,
     among other things, disclosing the trade secret despite knowing that it was acquired under
     circumstances giving rise to a duty to maintain its secrecy or limits its use or from a
     person who had a duty to maintain its secrecy or use.

129. Smart Mortgage took affirmative measures to keep its confidential and proprietary information secret.

130. Defendant Brian Noe received an offer of employment from Defendant Nexa Mortgage which he accepted.

131. Defendant Eileen Pruitt received an offer of employment from Defendant Nexa Mortgage which she accepted.

132. Defendants Brian Noe and Eileen Pruitt signed employment agreements with Smart Mortgage that included restrictive covenants concerning confidential information.

133. Defendant Brian Noe's computer at Smart Mortgage showed activity in which proprietary trade secret data and files were accessed and deleted on December 20, 2019.

134. Defendant Eileen Pruitt's computer at Smart Mortgage showed activity in which proprietary trade secret data and files were accessed and deleted on February 2, 2020.

135. Smart Mortgage has no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets by Defendants Brian Noe, Eileen Pruitt, Nexa Mortgage, and Secured Mortgage Processing. Injunctive relief is, therefore, necessary and appropriate to restrain the illegal misappropriation and use of such trade secrets and confidential information pursuant to the Defend Trade Secrets Act.

136. Unless Defendants are restrained and enjoined from using Smart Mortgage's trade secrets and confidential information, Smart Mortgage Centers will suffer immediate and irreparable injury in that Defendants will continue to have access and the ability to make use of the trade secrets and confidential information.

137. As a direct and proximate result of Defendants actual and threatened misappropriation of

Smart Mortgage's trade secrets and confidential information, Smart Mortgage has suffered

damages in an amount yet to be determined.  Defendant Nexa Mortgage has been unjustly

enriched. Pursuant to the Defense of Trade Secrets Act, Smart Mortgage is entitled to

recover damages. By reason of Defendants willful and malicious acts, Smart Mortgage is

entitled to an award of exemplary damages from Defendants in such amounts as is

necessary to punish Defendants and deter them from commission of like acts and, in

addition, reasonable attorneys' fees pursuant to the Defend Trade Secrets Act.

### COUNT II

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**

Plaintiff sues Defendants Brian Noe and Eileen Pruitt and alleges:

138.  Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1-62
     above as if each were more fully set forth herein.

139.  Defendants Brian Noe and Eileen Pruitt were both issued Smart Mortgage computers that
     were used in interstate commerce and constitute a "protected computer" under the Computer
     Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(e)(2)(b).

140. Without authorization or by exceeding authorized access, Brian Noe and Eileen Pruitt
     intentionally accessed their respective Smart Mortgage-issued computing devices and/or the
     Smart Mortgage network/email systems with the intent to defraud Smart Mortgage in
     violation of Sections 1030(a)(2)(c), (a)(4) and (a)(5) of the CFAA, including by:

     (a) obtaining certain information from the Smart Mortgage-issued computing

     devices and/or the Smart Mortgage network;

     (b) obtaining copies of certain documents and files of value from the

Smart Mortgage-issued computing devices and/or the Smart Mortgage network;

(c) and deleting electronic files from the Smart Mortgage-issued computing devices

and/or the Smart Mortgage network.

141. By engaging in the foregoing misconduct for the purpose of misappropriating Smart

Mortgage's Confidential Information and Trade Secrets, Defendants Brian Noe and Eileen

Pruitt breached their fiduciary duties and other obligations owed to Smart Mortgage.

Defendants Brian Noe and Eileen Pruitt had no authority or authorization for the foregoing

misconduct.

142. Defendants Brian Noe and Eileen Pruitt intentionally and recklessly caused damage and

loss to Smart Mortgage in excess of $5,000 because their conduct impaired the integrity of

Smart Mortgage's protected computers and required Smart Mortgage to expend resources

in excess of $5,000 to investigate the foregoing misconduct, conduct forensic examination

of the devices to ascertain the scope of Brian Noe and Eileen Pruitt's misconduct, and

perform certain remedial measures required as a result of such misconduct.

143. As a further direct and proximate cause of the foregoing misconduct, Smart Mortgage

has been damaged and suffered loss in an amount in excess of $5,000 to the extent the

Brian Noe and Eileen Pruitt accessed, deleted, destroyed and copied electronic files

containing Confidential Information and Trade Secrets belonging to Smart Mortgage for

their personal use and/or that of Nexa Mortgage, LLC.

WHEREFORE, Smart Mortgage respectfully requests that the Court enter an Order

granting judgment in favor of Smart Mortgage and against Defendants Brian Noe and

Eileen Pruitt on Count II and ordering the following relief:

(a) the issuance of temporary, preliminary and permanent injunctive relief enjoining

Brian Noe and Eileen Pruitt, and every person and entity acting in concert with them,

from directly or indirectly misappropriating, disclosing and/or using Smart Mortgage's
Confidential Information and Trade Secrets;

(b) the issuance of a mandatory injunction compelling Brian Noe and Eileen Pruitt, and
every person and entity acting in concert with them, including, but not limited to,
Defendants Nexa Mortgage and Secured Mortgage Processing, to return all documents
and other materials containing or constituting Smart Mortgage's Confidential
Information and Trade Secrets;

(c) the award of compensatory damages in an amount to be determined at trial
pursuant to 18 U.S.C. § 1030(g); and

(d) such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

Smart Mortgage respectfully requests that the Court find in its favor and against
Defendants on all Counts and that the Court grants Smart Mortgage the following relief:

A.     Permanently enjoining Defendants Brian Noe, Eillen Pruitt, Nexa Mortgage and its
       officers, directors, agents, servants, employees, affiliates, divisions, branches,
       subsidiaries, parents and all others acting in concert or privity with any of them, and
       Secured Mortgage Processing and its officers, directors, agents, servants,
       employees, affiliates, divisions, branches, subsidiaries, parents and all others acting
       in concert or privity with any of them from using Smart Mortgage's trade secrets;

B.     Awarding to Smart Mortgage the damages to which it is entitled for Defendants'
       misappropriation of Smart Mortgage's trade secrets up until the Defendants are
       finally and permanently enjoined from further infringement, including compensatory
       damages, under the Defend Trade Secrets Act;

C.   Awarding to Smart Mortgage the attorneys' fees to which it is entitled for

Defendants' misappropriation of Smart Mortgage's trade secrets;

D.   Awarding Smart Mortgage Centers costs and expenses in this action;

E.   Awarding Smart Mortgage Centers pre-and post-judgment interest on its

damages; and

F.   Such other and further relief as the Court deems just and equitable.

Smart Mortgage hereby demands a trial by jury.


                    For the Plaintiff

                    Smart Mortgage Centers, Inc.


                    By its attorney,
                    s/Wilton A. Person

                    _____

                    Wilton A. Person


ARDC # 6290441
Wilton A. Person
Attorney for the Plaintiff Smart Mortgage Centers, Inc.
24330 Leski Lane
Plainfield, Illinois 60585
(815) 254-2467
wperson@personlaw.com

## LOAN OFFICER RETENTION AGREEMENT

This Loan Officer Retention Agreement (the "Agreement") establishing an employment relationship between **Smart Mortgage Centers, Inc.**, an Illinois Corporation ("Smart") and _____ BRIAN W. ABE _____ (the "Loan Officer"), is dated as of this ____29____ day of ____OCTOBER____, 2013.

**WHEREAS,** Smart is a licensee pursuant to the Illinois Residential Mortgage License Act of 1987 (the "Act") operating from its corporate offices at 1355 South RT 59, Suite 202, Naperville, Illinois 60564 (the "Home Office").

**WHEREAS,** Loan Officer has represented to Smart that he or she has experience and knowledge in the origination of residential mortgages;

**WHEREAS,** Smart seeks to employ Loan Officer for the purpose of assisting Smart in the performance of activities by the Act, including the origination of residential mortgage loans ("Loans"); and

**WHEREAS,** Loan Officer is willing to become an employee of Smart for the purpose of assisting Smart in the origination of residential mortgage loans;

**NOW, THEREFORE,** in consideration of the mutual covenants, herein contained, the sufficiency of which is acknowledged, it is agreed as follows:

1.      **APPLICATIONS:** Loan Officer shall take all Mortgage Loan applications in the name of Smart and on behalf of Smart, including all mandatory application and disclosure forms required by Smart, the Act, or pursuant to other regulatory, legal or lender requirements. Loan Officer acknowledges and understands that the customers, customer leads, customer files, customer names and customer mortgage applications and the related customer files and documents that he or she produces for Smart during his or her employment with Smart belong to and are the sole and exclusive property of Smart Mortgage Centers, Inc. and these items are not the property of the Loan Officer. Initial here: ___/4\J___

2.      **REPRESENTATIONS:** (i) Loan Officer represents that he/she has read and has full knowledge of the Act, the other state and federal regulations affecting the residential mortgage industry ("Regulations") and agrees to operate fully within their purview, including but not limited to assisting only Smart in the performance of mortgage loan origination activities regulated by the Act and the Regulations; (ii) Loan Officer represents that he or she shall not enter into contracts (which relate in any way to this Agreement) with any person or entity

without prior written consent of Smart; and (iii) Loan Officer shall act exclusively as a Loan Officer for Smart and shall not be affiliated with any other mortgage banker, broker or other lender, without the prior written consent of Smart.

3.    (a)    **RESPONSIBILITIES AND DUTIES:**    Loan Officer hereby accepts the following responsibilities and duties:

a.    To perform to the best of his/her ability all duties assigned to him her by Smart and to carry out all Smart's policies and directives as described herein or as otherwise communicated to Loan Officer from time to time.

b.    To perform to the best of his/her ability said duties in compliance with the Act, Regulations and all other applicable laws.

c.    To fully comply with all state and federal laws, rules and regulations regarding the origination and processing of mortgage Loans.

d.    To not become involved in any personal or business matter which may adversely affect or reflect upon Smart.

e.    To attend all meetings, including Company policy and education meetings when required by Smart.

f.    To not engage in any form of fraud or other illegal activity regarding the origination and processing of Loans, including Loan Officer's agreement not to mislead prospective customers or otherwise induce customers to commit fraud in the loan origination process.

g.    To immediately lock in loan rates and terms at the customer directions.

h.    To comply with all licensure and certification requirements mandated by applicable state or federal laws, at the expense of Loan Officer.

i.    Loan Officer agrees and understands and agrees and understands that he or she is employed as an outside sales employee (see Schedule B).

j.    "Counseling Services"

i. Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.

ii.    Collecting financial information (tax returns, bank statement, etc.) and other related documents that are part of the application process.

iii.    Maintaining regular contact with the Borrower, Realtors, and Lenders between application and closing to apprise all parties of the status of the application and to gather any additional information as needed.

k.    To perform all of the above duties on a professional basis and to interact with all Smart staff with professionalism and courtesy.

4.     **TERMS OF AGREEMENT:** This agreement shall remain in effect on a continuous basis from the date of this Agreement, unless terminated in accordance with the termination provisions hereinafter set forth.

5.     **TERMINATION:** This Agreement may be terminated: (1) without cause by thirty (30) days prior written notice by either party; (ii) immediately with cause upon a material breach of any term of this Agreement by either of the parties upon notice to the other party; (iii) immediately upon Loan Officer's violation of any provisions of the Act or other laws or regulations.    Upon such termination, Smart shall continue to process all mortgage loan applications taken by the Loan Officer for Smart though the date of such termination. Cause shall exist to immediately terminate this Agreement upon the Loan Officer's breach of the provisions of Paragraph Nine (9) hereof or any other breach of the terms hereof or of the policies of Smart, any of which breach(s) shall be considered a material breach of this Agreement. Loan Officer acknowledges that all customers, borrowers, Mortgage Loans originated, and all documentation generated in the name of Smart are the sole and exclusive property of Smart, and Loan Officer agrees not to make any claim for any ownership interest in either the customers, Mortgage Loans, leads purchased by Smart, customer loan files and/or the related documentation that he or she produced while employed by Smart. Loan Officer agrees that he/she shall <u>not</u> remove or withdraw any mortgage loan application(s) submitted by Smart to a mortgage banker/broker, and resubmit said loan(s) to another mortgage banker/broker, without the prior written consent of Smart.

6.     (b)    **DESCRIPTION OF FINANCIAL SERVICES:**  Loan Officer will provide the following services:

    a.     Loan Officer agrees and understands that his or her duties include various services for Smart, such as collecting and analyzing information and data regarding all customer's income, assets, investments, or debts; determining and assessing which mortgage loan products best meet the customer's needs and financial considerations; advising the customer about the advantages and disadvantages of various mortgage loan products that the customer may qualify for; and marketing, servicing and promoting mortgage loan products made available through Smart from time to time;

    b.     Provide customary assistance in connection with the processing of Mortgage Loan applications for Smart;

    c.     Send Mortgage Loan applications for underwriting approval only to investors with whom Smart has entered into Correspondent Agreements (the "Investors");

     d.     Arrange and attend, if necessary the closing of said Mortgage Loans; and collect all monies due and owing to Smart, made payable only to Smart, and for deposit only by Smart, as a result of each completed Mortgage Loan transaction.

     e.     Educating the Borrower in the home buying and financing process, advising the Borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product.

     f.     Assisting the Borrower in understanding and clearing credit problems.

7.     **DEPOSIT OF FUNDS:**  All funds or drafts received by Loan Officer during his employment at Smart, such as application deposits, appraisal fees, credit reporting fees, title charges, etc., shall be made payable only to Smart and shall immediately be delivered to Smart, to be deposited into Smart's "Operations Account" with documentation as to the source, use and disposition of said funds. To the extent reasonably feasible, the documentation submitted to Smart with each draft or check shall identify in writing the name of Smart's borrower(s). Loan Officer acknowledges that he/she shall be responsible for the collection of all fees in connection with mortgage Loans originated by Loan Officer, and, if not so collected by Loan Officer from Borrower at the time of Loan closing, then Smart shall the right to set off and deduct from any amounts due Loan Officer hereunder any amounts not paid, including but not limited to the above, and any shortages created by improperly processing said mortgage Loans; unpaid amounts due Smart; bounced Borrower(s) checks; any and all legal fees and costs relating to such matters; lender premium repayments for loans originated in violation of a lender's correspondent agreement with Smart and other items due Smart or third parties relating to Loan Officer, his or her Borrower(s) or otherwise.

All commission or other checks generated by closed Mortgage Loan transactions must be made payable to **"Smart Mortgage Centers, Inc."**, delivered to the Home Office, for deposit only by Smart into its "Operating Account", for allocation and payment by Smart. If Loan Officer deposits any above-described commission or other check(s) into an account that is controlled by Loan Officer or another person, and not by Smart, then such Loan Officer action shall constitute an immediate breach and termination of this Agreement, shall subject the Loan Officer to forfeiture of any and all amounts due Loan Officer hereunder, to immediate payment to Smart of any outstanding bills and invoices generated by Loan Officer; possible criminal investigation and civil action and fines.

8.     **COMPENSATION MATTERS:**  Smart agrees to make payments to Loan Officer in accordance with Schedule A attached hereto and incorporated by reference into this Agreement. Loan Officer agrees to make payments to Smart in accordance with the terms hereof. Loan Officer represents and warrants to Smart that if Loan officer is not entitled to a paycheck for any pay period that he did not render any services to Smart during that period. Smart reserves the

right to change the pay structure, see Schedule A, by giving the Loan Officer written notice of thirty (30) days.

9.      **EXCLUSIVITY:**  Loan Officer agrees that he/she shall not be affiliated with or otherwise perform any licensable services for: (i) any other licensee under the Act; or (ii) any other entity exempt from licensure under the Act; or (iii) any other entity that is required to become licensed under the Act but is not so licensed while this Agreement is in effect. Any breach of the provisions of this Paragraph Nine (9) shall be considered a material breach of this Agreement and shall be grounds for immediate termination of this Agreement.

10.     **ADVERTISING:**  All advertising proposed for use by Loan Officer must be pre-approved by Smart prior to its use. Advertising shall be deemed to include, but not limited to, advertisements in newspapers, magazines. other periodicals, radio spots, television commercials, computer bulletin boards and the Internet (a/k/a The World Wide Web), mailing pieces, business cards, etc. Smart shall approve or reject said advertising in a timely manner. All such advertising shall be on behalf of Smart and shall comply with applicable provisions of the Act and the Regulations. Advertising may include the name of the Loan Officer as an employee of Smart.

11.     **MUTUAL OBLIGATIONS OF LOAN OFFICER AND SMART:**  (i) Except for matters relating to mortgage loan originations for Smart consumers, Loan Officer does not have the authority to bind Smart contractually without the prior written consent of Smart; (ii) Loan Officer must utilize appraisers, credit reporting companies, title insurance companies and flood certification companies and other vendors approved by Smart or its correspondent lenders; and (iii) Loan Officer must submit to Smart's Processing Department all new mortgage loan applications on a daily basis within 24 hours of receipt.

12.     **HOLDBACK AND PAYMENT OF FUNDS UPON TERMINATION:** In the event this Agreement is terminated in accordance with the terms hereof, Smart shall have the right to withhold payment of any and all amounts due to Loan Officer for a period not to exceed sixty (60) days to ensure that all outstanding bills owed to Smart, to third-party vendors of Smart or otherwise; have been paid in full. If it is discovered that any obligation of the Loan Officer has not been paid which directly relates to a Mortgage Loan being processed or obligations owned to Smart, then, in that event, Smart shall pay such obligation on behalf of the Loan Officer: (i) first, from the funds withheld from Loan Officer, and (ii) in the event that such funds are insufficient, then, at Smart's election, from Smart's with reimbursement by Loan Officer to Smart. Loan Officer agrees and understands that he or she shall be entitled to fifty percent (50%) of the compensation set forth on Schedule A (Pay Plan) in the event of Loan Officer's voluntary termination of employment; and Loan Officer agrees that he or she not be entitled to any further

compensation from Smart if Loan Officer's employment is terminated for cause because Loan Officer engaged in any type or form of fraud in the loan settlement process; or otherwise breached the terms of this Agreement.

13.   **DELIVERY OF DOCUMENTATION:**  Loan Officer agrees that upon entering into a Loan Brokerage Agreement (as defined in the Act) with a Borrower on behalf of Smart, Loan Officer shall immediately supply Smart with the originally signed copy of such agreement(s). Loan Officer further agrees that all pertinent data for each Mortgage Loan file produced for Smart shall be delivered to the Home Office of Smart within 24 hours of Loan Officer's receipt of same. Smart shall maintain said files in or under the control of the Home Office and these files may be made available for review by Loan Officer during regular business hours. Upon termination, it is the responsibility of the Loan Officer to deliver the keys to the Home Office by close of business that day. If not done, Loan Officer will be charged for the locks to be changed.

14.   **COMMISSIONER'S EXAMINATIONS:**  Loan Officer acknowledges that Smart may be examined by the IDFPR, Office of Banks and Real Estate under the Act, FHA and/or Smart's independent auditors. Loan Officer agrees to cooperate fully with any and all such examinations and audits.

15.   **INDEMNIFICATION:**  Loan Officer acknowledges that he/she is an agent of Smart, and accordingly, Smart may be accountable for certain acts or omissions of the Loan Officer occurring within the scope of the Loan Officer's authority under this Agreement. Smart may be liable to Borrowers of Smart, Investors and to certain third party vendors used by Loan Officer as a result of mortgage origination activities of Loan Officer. It is acknowledged by Loan Officer that Smart may be responsible for the acts of Loan Officer that are performed within the course of his/her duties and responsibilities, and Loan Officer hereby indemnifies, holds harmless and shall defend Smart and its officers, directors, shareholders, employees, agents and attorneys from any and all claims or demands of any kind regarding Loan Officer's alleged breach of the terms of this Agreement; any claims by any third party alleging a breach of covenants not to compete or otherwise; or any other matter. Loan Officer shall pay all legal fees, court costs, fines, penalties or other charges (e.g. filing fees, expert witness fees, etc.) relating to any litigation or other proceeding initiated by either a Borrower(s), lender, investor or any regulatory agency regarding Smart and/or Loan Officer, as shall be determined in the sole discretion of Smart.

In addition to any other remedies that the Lender may have, Loan Officer shall indemnify and hold Lender, its stockholders, affiliates and their respective officers, directors, employees and agents, harmless from and against, and shall reimburse it or them for, any losses, damages, deficiencies, claims, causes, of action or expenses of any nature (including reasonable attorney's fees) incurred at any time arising out of, in connection with or resulting from:

(a) Any misrepresentation made by Loan Officer, or in any schedule, exhibit, report, statement or certificate furnished by Loan Officer pursuant to this Agreement;

(b) The non-fulfillment or non-performance of any covenant, condition or action required of Loan Officer pursuant to this Agreement; or

(c) Any fraud in the preparation or delivery of any mortgage loan application file, known to Loan Officer or Broker, representative or agent of Broker.

(d) Loan Officer understands Smart has agreements with all Lenders that could have early payoff requirements.   Loan Officer agrees not to solicit a Borrower for financing if a customer's loan was last financed with Smart and has a specified period of time that a Lender will ask for a yield spread premium to be refunded. Loan Officer agrees if this situation occurs that the Loan Officer will bring it to the attention of an Officer of Smart. If Loan Officer does finance a customer that Loan Officer will be responsible and liable to reimburse Smart for all costs and can be subject to termination.

16.    **CONFIDENTIALITY:** Loan Officer recognizes that Smart has and will have information such as customer names, customer lists, leads, customer files, mortgage loan documentation, and other confidential information regarding Smart's business operations ("Information"). Loan Officer agrees that Loan Officer will not, at any time nor in any manner, either directly or indirectly, use any "Information" for Loan Officer's own benefit, or divulge, disclose, or communicate in any manner any "Information" to any third party, without the prior written consent of Smart. Loan Officer will protect the "Information" and treat it as strictly confidential. A violation of this paragraph shall be a material violation of this Agreement and shall entitle Smart to seek injunctive relief as well as damages.

Loan Officer agrees and acknowledges that he or she shall not do business with any customer of Smart, including those Smart customers that were produced by Loan Officer during the term of the agreement for a period of one (1) year from the date of Loan Officer's termination of employment with Smart. Loan Officer agrees to advise Smart within twenty-four (24) hours of the time of such customer contact in writing if he or she is contacted by an Smart customer, seeking to procure a mortgage loan within the one (1) year period following the Loan Officer's termination of employment with Smart. Loan Officer will take no further action to complete a loan for the Smart customer without the prior written consent of Smart.

If it appears that Loan Officer has disclosed or has threatened to disclose "Information" in violation of this Agreement, Smart shall be entitled to an injunction to restrain Loan Officer from disclosing, in whole or in part, such "Information", or from providing any services to any party to whom such "Information" has been disclosed or may be disclosed. Smart shall not be

prohibited by this provision from pursuing any and all other remedies, including a claim for other losses and damages from Loan Officer.

This provision shall remain in full force and effect for a period of one (1) year after the termination of this Agreement.

17.     **RETURN OF RECORDS AND PROPERTY:** Upon termination of the Loan Officer's employment with Smart, Loan Officer, within twenty-four (24) hours, shall immediately deliver all customer names, customer files, records, notes, door keys, data (i.e. computer processing data) in his/her possession, or under Loan Officer's control that are Smart's property or relate to Smart's business.

18.     **EARLY LOAN PAYOFFS:**  Loan Officer agrees that agreements are in place with Lenders, and if a loan pays off early with a Lender, even if that Loan Officer is not part of the pay-off, that the Loan Officer's commission will be collected and sent back to the Lender. Loan Officer agrees to check with Smart Mortgage Centers, Inc. on the policy for each Lender before soliciting the loan for refinancing or putting a customer in a loan knowing that the customer will pay off the loan in a specified period of time.

19.     **MISCELLANEOUS:**
(a)     **AMENDMENT:** Neither this Agreement nor any term hereof may be amended, waived, discharged orally, but only by instrument in writing signed by each of the parties.
(b)     **HEADINGS:** The headings in this Agreement are for convenience or reference only and shall not define or limit the provisions hereof.
(c)     **APPLICABLE LAW:** This Agreement shall be construed in accordance with and governed by the Laws of the State of Illinois.
(d)     **COUNTERPARTS:** This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which together shall constitute but one instrument.
(e)     **JURISDICTION OF COURTS:** Any judicial proceedings between the parties under this Agreement shall be brought in the Circuit court of Dupage, Will or Cook County, Illinois.
(f)     **PARTIES IN INTEREST:** All of the terms, covenants, and conditions herein contained shall inure to the benefit of and the binding upon the parties hereto, their heirs, successors and assigns.
(g)     **NOTICES:** Notices under this Agreement shall be in writing and be personally delivered or sent by certified or registered mail, return receipt requested, to the parties at their addresses specified below or at such address designated in writing to all pursuant to this paragraph.

(h)     **SMART** reserves the right to revise commissions, processing fees, insurance fees and other matters upon fifteen (15) days prior written notice to Loan Officer.

(i)     **DISPUTES:** Loan Officer agrees that any disputes of the Loan Officer arising under this Agreement shall be handled through arbitration at the election of Smart. Loan Officer agrees that no litigation, suit or other proceeding shall be filed against Smart until such arbitration is concluded in all respects.

(j)     **EMPLOYEE CONTACT:** Loan Officer shall not solicit, hire or otherwise induce any employee or consultant of Smart to terminate its employment or consulting relationship with Smart. Loan Officer understands and agrees that it is difficult to compute the damages that Smart may incur if Loan Officer solicits, hires or otherwise induces an employee to terminate his or her employment with Smart. Loan Officer agrees that this liquidated damages clause is reasonable and does not constitute a penalty. Loan Officer agrees that any violation of this provision shall subject Loan Officer to liquidated damages of $40,000 payable to Smart for each person who leaves Smart to either work for or become employed by the terminated Loan Officer or an entity associated with employs the terminated Loan Officer. Loan Officer agrees that the liquidated damages of $40,000 are not a penalty and reasonably approximate the cost to recruit, train, and reimburse Smart Mortgage Centers, Inc. for the loss of each person's services to Smart.

(k)     **INTRODUCTORY PERIOD:** Your first sixty (60) days of employment at Smart is considered an Introductory Period, and during that period you will not accrue benefits available from the company, unless otherwise required by law, or unless otherwise provided in the applicable benefit plan document. This Introductory Period will be a time for getting to know your fellow employees, your manager/supervisor and the tasks involved in your job position, as well as becoming familiar with Smart's business.

This Introductory Period is a try-out time for both of you, as an employee, and Smart, as an employer. During this Introductory Period, Smart will evaluate your suitability for employment, and you can evaluate Smart as well. At any time during this first sixty (60) days, you may resign without any detriment to your record. If during this period, your work habits, attitude, attendance or performance do not measure up to our standards, we may discharge you. If you take approved time off during the Introductory Period, the Introductory Period may be extended by that length of time.

At the end of the Introductory Period, your manager/supervisor may discuss your job performance with you. During the course of the discussion, you are encouraged to give your comments and ideas as well. Please understand that completion of the

Introductory Period does not assure continued employment for any specified period of time.

(l)   **COMPANY VENDORS:**   If Loan Officer's employment with Smart shall terminate for any reason, then Loan Officer agrees not to contract or use the services of any vendor who provides services to Smart through the use of access code, account number, identifying number, password, user ID, or other code used by Smart, without the prior written consent of an authorized officer of Smart.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**Loan Officer**

_____
Name

_____
Address

_____
City/State/Zip

_____
Loan Officer's Signature

**Smart Mortgage Centers, Inc..**

1355 South RT 59, Suite 202
Naperville, Illinois 60564
By:

_____

Its:   President

10/29/2013

_____
Loan Officer's Social Security Number

**SCHEDULE B**

Outside Sales Employee Rider to Smart Mortgage Centers, Inc. Loan Officer Retention Agreement



**Loan Originator: Brian Noe - 228140**

Schedule "A" of Employee Retention Agreement

**Compensation Plan**

- Base compensation = 125 bps (based on a 250 bps contract)
- Base compensation = 100 bps (based on 200 bps contracts)
- Base compensation = 90 bps (based on 175 bps contracts)
- Base compensation = 75 bps (based on 150 bps contracts)
- Base compensation = 50 bps (based on a 100 bps contract)

**Production Bonus:**

Production bonus loan volume over 500,000 20 bps
Production bonus loan volume over 1,000,000 40 bps
Production bonus loan volume over 1,500,000 50 bps
Production bonus loan volume over 2,000,000 60 bps
Self Generated Business non-smart related +10 bps

**Administration Fee:**

- Loan Amount 130,000 and under = 130.00
- Loan Amount 130,000 and over = 395.00

**Reverse Mortgage = 50%**

Richard Birk 4/12/2014
Smart Mortgage Centers, Inc.
President

Printed Name: Brian Noe – NMLS 228140
4/12/2014
Signed

Notwithstanding anything in the Loan Officer Retention Agreement to the contrary, it is the intention of Smart Mortgage Centers, Inc. and Loan Officer under the Loan Officer Retention Agreement, ("Employee") that Employee's job duties and responsibilities, as set form in this Loan Officer Retention Agreement and Rider, qualify employee for the minimum wage and overtime pay exemption for outside sales employees set forth in section (a)(1) of the Fair Labor Standards Act ("FLSA"), and regulations promulgated there under. Employee understands and agrees that Employee's job duties and responsibilities are such that Employee will be exempt from the minimum wage and overtime pay requirements of the FLSA and therefore, Employee shall be treated by Employer as exempt from the minimum wage and overtime pay requirements of the FLSA and Illinois minimum wage and overtime laws.

Employee's job duties and responsibilities as a Loan Officer for Employer shall consist of the duties outlined in the Loan Officer Retention Agreement including this Rider some but not all of which are described as follows:

1. Employee's primary duty shall be the selling of mortgage loan products offered by Employer;
2. Employee shall meet with prospective borrowers, in person, to sell the mortgage loan products offered by Employer;
3. Employee shall be responsible for originating Employee's own sales by contacting prospective borrowers and by developing and maintaining referral sources;
4. Employee is expected to, and shall, spend a significant amount of time away from Employer's place of business in performing Employee's primary duty of selling the mortgage loan products offered by Employer;
5. Employee is expected to, and shall, meet with prospective borrowers at locations other than Employer's place of business, such as at the prospective borrower's home or other location away from Employer's place of business;
6. Employee's contact with prospective borrowers by telephone, mail or e-mail shall be adjunct to in-person contact with the prospective borrowers;
7. Employee shall obtain credit information and other necessary information and documentation from prospective borrowers for the loan application process;
8. Employee shall make in-person calls on real estate agents and brokers, financial advisor, and other potential referral sources to develop borrower leads;
9. Employee may also engage in marketing and promotional activities in support of Employee's own sales;

10. Employee shall have considerable flexibility in setting employee's own working hours and scheduling the tasks Employee performs during the work day;

11. Employee is expected to, and shall, customarily and regularly be engaged away from Employer's place of business;

12. Employee may spend some time in Employer's office taking loan applications, attending meetings, completing paperwork, preparing marketing and sales materials in support of Employee's own outside sales efforts; and

13. Additional tasks that may be performed at Employer's place of business may include checking and updating databases of loan products for sale and referral sources; calling, writing, or e-mailing borrowers or prospective borrowers with whom Employee has been dealing during Employee's outside sales activities; talking to borrowers or prospective borrowers in the office about their particular loan transaction; calling, writing, or e-mailing prospective borrowers or prospective referral sources with whom Employee may not have had prior contact; and preparing loan applications and other forms of loans initiated or negotiated by Employee during Employee's outside sales activities. Employer's place of business shall mean and include any office of Employer, as well as any fixed site, whether home or office, used by Employee as headquarters or for electronic or telephonic solicitation of sales, regardless of whether Employer is the owner or tenant of the property.

In performing the job duties and responsibilities set forth in this paragraph Loan Officer Retention Agreement and Rider, Employee shall abide by and fully comply with (i) any and all rules, policies, procedures and orders which Employer or Lender's Employer deals with may from time to time adopt or give; and (ii) all applicable federal, state, and local laws, statuses, regulation, rules and ordinances, as currently in effect or hereafter amended, including, but not limited to, the Truth and Lending Act ("TILA") and Regulation "Z" promulgated there under, the Real Estate Settlement Procedures Act ("RESPA") and Regulation "X" promulgated there under, and the Illinois Residential Mortgage License Act of 1987 ( the "Act") and all rules and/or regulations promulgated there under governing Employee's activities as a Loan Officer.

In Agreement herewith the parties have set their hand on the date next to their signature.

Smart Mortgage Centers, Inc.:                                      Employee:

_____ President                    _____
NAME                        TITLE

## LOAN OFFICER RETENTION AGREEMENT

This Loan Officer Retention Agreement (the "Agreement") establishing an employment relationship between Smart Mortgage Centers, Inc., an Illinois Corporation ("Smart") and ___BRIAN   W   Not___ (the "Loan Officer"), is dated as of this ___1st___ day of ___JANUARY___, 2018.

WHEREAS, Smart is a licensee pursuant to the Illinois Residential Mortgage License Act of 1987 (the "Act") operating from its corporate offices at 4003 Plainfield/Naperville Rd., Suite 207, Naperville, Illinois 60564 (the "Home Office").

WHEREAS, Loan Officer has represented to Smart that he or she has experience and knowledge in the origination of residential mortgages;

WHEREAS, Smart seeks to employ Loan Officer for the purpose of assisting Smart in the performance of activities by the Act, including the origination of residential mortgage loans ("Loans"); and

WHEREAS, Loan Officer is willing to become an employee of Smart for the purpose of assisting Smart in the origination of residential mortgage loans;

NOW, THEREFORE, in consideration of the mutual covenants, herein contained, the sufficiency of which is acknowledged, it is agreed as follows:

1.      APPLICATIONS: Loan Officer shall take all Mortgage Loan applications in the name of Smart and on behalf of Smart, including all mandatory application and disclosure forms required by Smart, the Act, or pursuant to other regulatory, legal or lender requirements. Loan Officer acknowledges and understands that the customers, customer leads, customer files, customer names and customer mortgage applications and the related customer files and documents that he or she produces for Smart during his or her employment with Smart belong to and are the sole and exclusive property of Smart Mortgage Centers, Inc. and these items are not the property of the Loan Officer. Initial here: _BN_

2.      REPRESENTATIONS: (i) Loan Officer represents that he/she has read and has full knowledge of the Act, the other state and federal regulations affecting the residential mortgage industry ("Regulations") and agrees to operate fully within their purview, including but not limited to assisting only Smart in the performance of mortgage loan origination activities regulated by the Act and the Regulations; (ii) Loan Officer represents that he or she shall not enter into contracts (which relate in any way to this Agreement) with any person or entity without prior written consent of Smart; and (iii) Loan Officer shall act exclusively as a Loan Officer for Smart and shall not be affiliated with any other mortgage banker, broker or other lender, without the prior written consent of Smart.

X BN